STATE OF CONNECTICUT *v.* JOHN C. COHANE
(9137)
(9138)

SPEZIALE, C. J., PARSKEY, SHEA, GRILLO and COVELLO, Js.

Argued February 2—decision released June 26, 1984

*Jon C. Blue,* assistant public defender, with whom, was *Hugh F. Keefe,* special public defender, for the appellant (defendant).

*Kurt Weist,* law student intern, with whom were *Julia D. Dewey,* assistant state's attorney, and, on the brief, *Arnold Markle,* state's attorney, for the appellee (state).

SPEZIALE, C. J. The defendant was convicted by a jury of the crimes of murder, General Statutes § 53a-54a (a), and assault in the first degree, General Statutes § 53a-59 (a) (1). He has appealed from the trial court's judgment of guilty, entered pursuant to the conviction. We find error both in the trial court's instructions to

the jury and in the state's failure to disclose evidence favorable to the accused.

The jury could reasonably have found the following facts: At or about 7:45 p.m. on March 22, 1975, Steven Lawry and a female companion, both eighteen years of age, were in Lawry's car, parked on a dirt road near Baldwin Drive in Hamden. Baldwin Drive is a secluded road in the West Rock area of Hamden. It is known as a lovers' lane. The couple were in the front seat of the car when another person approached the car on foot from the driver's side and fired several shots from a .22 caliber rifle at them. The assailant then moved to the passenger's side of the car, smashed out the passenger's window, and fired several more shots inside. The female victim was struck by eight bullets and died almost instantly. Lawry was shot six times but was able to drive the car to a relative's home, where he summoned aid. Lawry survived the attack and was able to give investigating officers a vague description of the assailant.

At some point during the ensuing investigation the Hamden police identified the defendant as a suspect. Within three weeks of the shooting three different Hamden police officers questioned the defendant concerning his activities on March 22, 1975. On April 16, 1975, Hamden police officers, acting pursuant to a search warrant signed by a judge of the Superior Court, searched the defendant's home and automobile. They seized, among other things, a bill of sale for a .22 caliber rifle, a .22 caliber casing, and a .22 caliber bullet.[1]

---

[1] The bill of sale and the .22 caliber casing were seized from the defendant's automobile. The .22 caliber bullet was removed from a basement door in the defendant's home. The defendant filed a pretrial motion to suppress all evidence seized under authority of the search and seizure warrant. Although the trial court did suppress certain evidence seized under the warrant, these three items were admitted into evidence. The defendant has not challenged their admission on appeal.

The police then took the defendant to Hamden police headquarters where he was charged with murder and with assault in the first degree in connection with the shooting of Lawry and his companion. A grand jury subsequently indicted the defendant on the murder charge.[2]

On April 30, 1975, the defendant filed a motion for a hearing to determine his competency to stand trial. The trial court, *Naruk, J.,* ordered such a hearing pursuant to General Statutes (Rev. to 1975) § 54-40,[3] and appointed two psychiatrists to examine the defendant and report their findings to the court. After a hearing on the matter the trial court, *Levine, J.,* found the defendant competent to stand trial.

On June 16, 1976, the defendant moved for a reexamination of his competency to stand trial. After another hearing, the trial court, *O'Brien, J.,* found the defendant competent to stand trial so long as he continued to receive medication prescribed to control symptoms of psychosis. Shortly before trial, the defendant again moved for a hearing to determine his competency to stand trial. He claimed that continued ingestion of anti-psychotic drugs altered his deportment and demeanor to such an extent that he could not be considered competent to stand trial. After a hearing, the trial court, *Hadden, J.,* found that the defendant was "able to understand the proceedings against him and to

[2] At the time, article first, § 8 of the Connecticut constitution and General Statutes § 54-45 required a grand jury indictment as a precondition to trial for all charges punishable by death or life imprisonment. Both the constitutional and statutory requirements for grand jury indictments have since been repealed. Conn. Const., amend. XVII; Public Acts 1983, No. 83-210; see *State* v. *Sanabria,* 192 Conn. 671, 686–99, 474 A.2d 760 (1984).

[3] Statutory provisions concerning a criminal defendant's competency to stand trial and the procedures attending a determination of competency are now set out in General Statutes § 54-56d.

assist counsel in his own defense" and held that he was competent to stand trial. General Statutes § 54-40 (c). The case then went to trial.

Because the only known witness to the shooting, Lawry, was unable to identify the assailant, the state's case-in-chief relied primarily on several inculpatory statements made by the defendant after his arrest and on circumstantial evidence provided by the testimony of witnesses tending to link the defendant to the shooting. A ballistics expert testified that a bullet taken from the female victim's body and a bullet found lodged in a door at the defendant's home had been fired from the same .22 caliber rifle. Three other witnesses who had been parked on Baldwin Drive on the night of the shooting identified the defendant's mother's car and testified that it had been parked near the Lawry vehicle on Baldwin Drive that evening. Elizabeth Cohane, the defendant's mother, testified that the defendant had driven her car from the family home early that evening and returned shortly after 9 p.m.

Although the defendant did not admit that he was involved in any way with the shooting, he did not offer any evidence directly contradicting the state's allegation that he shot the victims. Instead, he put the state to its proof on the issue of identity and relied on a defense of insanity. At the time, General Statutes § 53a-13[4] provided, in relevant part, that insanity constituted a defense to a criminal charge if the defendant "as a result of mental disease or defect lacked substantial capacity either to appreciate the wrongfulness of his

[4] "[General Statutes (Rev. to 1975)] Sec. 53a-13. INSANITY AS DEFENSE. In any prosecution for an offense, it shall be a defense that the defendant, at the time of the proscribed conduct, as a result of mental disease or defect lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. As used in this section, the terms mental disease or defect do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct."

conduct or to conform his conduct to the requirements of law." The defendant claimed, in essence, that at the time of the shooting he was in an uncontrollable psychotic rage caused by his observations of sexual activity in Lawry's car and that he therefore lacked substantial capacity to appreciate the wrongfulness of his conduct or to act in conformity with the law.

The defendant introduced the testimony of a number of lay witnesses who described the defendant as a troubled person, given to bizarre behavior and having a disturbed outlook on life in general, and sexuality in particular. The defense relied most heavily on the expert testimony of four psychiatrists, each of whom had examined the defendant before trial. Each of the four psychiatrists testified that the defendant was suffering from a mental disease or defect at the time of the shooting and that he lacked a substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. The defendant did not testify at trial; however, his account of the shooting was rendered by each of the psychiatrists as each described the basis for his conclusion as to the defendant's mental state.

The state offered the expert testimony of one psychiatrist in rebutting the defendant's claim of insanity. The state's witness agreed that the defendant suffered from a mental disease or defect but concluded that at the time of the crime the defendant had the capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of law.

On May 27, 1977, the jury returned a verdict of guilty on both charges. The trial court imposed consecutive sentences of twenty years to life on the murder charge and five to ten years on the assault in the first degree charge, for a total effective sentence of twenty-five years to life.

The defendant has appealed from the judgment of conviction claiming error on several issues. We hold that (1) the trial court's error in failing to instruct the jury that it could not draw any inference from the defendant's decision not to testify, and (2) state's attorney Arnold Markle's failure to disclose evidence favorable to the accused compel a new trial. Therefore, we do not fully address the other claims of error.[5]

---

[5] The defendant also claimed error in (1) the trial court's failure to instruct the jury that they might not discuss the case among themselves before the trial judge submitted the case to them, (2) the trial court's instructions to the jury on the defense of insanity, and (3) certain post trial orders of the trial court.

The trial court in cautioning the jury about pre-deliberation discussions did not instruct the jurors that they might not discuss the case among themselves before the court submitted the case to them. See *State* v. *Washington,* 182 Conn. 419, 438 A.2d 1144 (1980). Because the defendant failed to object to the instruction at the time it was made, however, we will not consider the issue on appeal. This court will consider claims of error raised for the first time on appeal only "where a new constitutional right not readily foreseeable has arisen between the time of trial and appeal" or "where the record adequately supports a claim that a litigant has clearly been deprived of a fundamental constitutional right and a fair trial." *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). Neither situation is present here. In *State* v. *Johnson,* 188 Conn. 515, 518A, 450 A.2d 361 (1982), we recognized that *State* v. *Washington* did not establish a new constitutional right and therefore did not fit within the first *Evans* exception. *State* v. *Johnson,* supra. And, as was the case in *State* v. *Johnson,* the record on this appeal does not "clearly disclose that the litigant has been deprived of a fundamental constitutional right and a fair trial"; id., 519; and therefore does not fit within the second *Evans* exception.

The defendant also claims error because the trial court, after properly instructing the jury about the insanity defense using the words of the relevant statute, General Statutes (Rev. to 1977) § 53a-13, then responded to the jury's request for further instructions by delivering the *M'Naghten* rule, the irresistible impulse test, and other instructions reflecting the common law rather than the statutory rule. The state argues that this claim of error should not be reviewed because the defendant failed to object properly to the erroneous instruction. Our holding as to the other issues in this case makes it unnecessary for us to decide whether the defendant preserved his claim sufficient to warrant reversal. We emphasize, however, that the statutory standard for determining a defendant's sanity constitutes the only appropriate referent for the jury. "[T]he only standard by which to determine insanity as a defense to a crime is that found in General Statutes

## I

On May 25, 1977, at the conclusion of all testimony in the case, the defendant submitted certain requests to charge the jury. One such request concerned the defendant's exercise of his right under the fifth and fourteenth amendments to the United States constitution and article first, § 8 of the Connecticut constitution not to give evidence against himself. The defendant's request asked the court to instruct the jury about that right and to add that "[a]bsolutely no inference of guilt can be drawn from the exercise by the accused of his constitutional right not to testify."

After hearing argument by defense counsel and the state's attorney concerning proposed jury instructions the trial court ruled that it would not give the "no-adverse-inference" charge as requested by the defendant. In keeping with that ruling, on May 26, 1977, the trial court instructed the jury on this issue as follows: "An accused person is under no obligation to become a witness in his own behalf. Under our law, an accused person may either testify or not as he sees fit. It is for the State to prove him guilty and no burden rests upon him to prove his innocence."

The defendant excepted to the charge for its failure to include the instruction that the jury could not draw

§ 53a-13." *State* v. *Toste,* 178 Conn. 626, 633, 424 A.2d 293 (1979); see *State* v. *Jones,* 193 Conn. 70, 85, 475 A.2d 1087 (1984). In some circumstances the trial court may be able to cure such an erroneous instruction by repeating the correct statutory definition. *State* v. *McCall,* 187 Conn. 73, 86–87, 444, A.2d 896 (1982); see *State* v. *Jones,* supra. Where the trial court does not give a sufficiently curative instruction, however, it is reversible error for the trial court to instruct a jury by reference to any superseded tests for insanity such as the *M'Naghten* rule, the *Durham* rule, or the irresistible impulse test, provided the defendant properly excepts to the instruction.

Our holding as to the other claims of error also makes it unnecessary for us to address the defendant's claims concerning the trial court's post trial orders.

any inference of guilt from the defendant's decision not to testify. On appeal the defendant claims that the trial court erred in its instruction and that reversal is required. We agree.

The fifth amendment to the United States constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." That provision acts as a restraint upon the individual states as well as the federal government under the fourteenth amendment to the United States constitution. *Malloy* v. *Hogan,* 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1963). Article first, § 8 of the Connecticut constitution affords criminal defendants a similar protection in language at least as broad as its federal counterpart. That section, which sets forth the rights of accused persons in criminal prosecutions, provides that "[n]o person shall be compelled to give evidence against himself . . . ."

In *Carter* v. *Kentucky,* 450 U.S. 288, 101 S. Ct. 1112, 67 L. Ed. 2d 241 (1981), the United States Supreme Court addressed the question whether, as part of the fifth amendment's protection against self-incrimination, a trial court must instruct the jury that they may not draw inferences of guilt from a criminal defendant's exercise of that right when the defendant properly requests such an instruction. The court held that such a "no-adverse-inference" instruction is essential to the full and free exercise of the fifth amendment right against self-incrimination and to the system of justice that it is designed to uphold. "The principles enunciated in our cases construing this privilege, against both statutory and constitutional backdrops, lead unmistakably to the conclusion that the Fifth Amendment requires that a criminal trial judge must give a 'no-adverse-inference' jury instruction when requested by a defendant to do so." *Carter* v. *Kentucky,* supra, 300.

Because the right to such an instruction is part of the fifth amendment right against self-incrimination, it is imported through the fourteenth amendment to criminal defendants in state court proceedings. Id., 297; *Malloy* v. *Hogan,* supra. Because the Connecticut constitution's protection against self-incrimination is at least as broad as the federal provision, we now hold that a criminal defendant has an independent right under article first, § 8 of our constitution to the same "no-adverse-inference" instruction upon proper and timely request.[6] See *Michigan* v. *Long,* 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983); *State* v. *Ferrell,* 191 Conn. 37, 45 n.12, 463 A.2d 573 (1983).

In the present case the trial court instructed the jury on May 26, 1977. At that time neither the United States Supreme Court nor this court had yet recognized the "no-adverse-inference" instruction as a component of self-incrimination protections. The United States Supreme Court did not announce the rule until March 9, 1981. *Carter* v. *Kentucky,* supra. Nevertheless, in *State* v. *Dudla,* 190 Conn. 1, 5, 458 A.2d 682 (1983), we held that "the rule of *Carter* v. *Kentucky,* supra, is to be applied to all convictions that were not yet final at the time the decision was rendered." In a footnote to that holding we noted that "[a] judgment is considered final for these purposes when all avenues of direct appeal have been exhausted or when the time for filing a direct appeal has passed." *State* v. *Dudla,* supra,

---

[6] In explaining the basis for the court's holding that the "no-adverse-inference" instruction is a component of the fifth amendment's protection against self-incrimination, Justice Stewart, writing for the majority in *Carter,* observed: "No judge can prevent jurors from speculating about why a defendant stands mute in the face of a criminal accusation, but a judge can, and must, if requested to do so, use the unique power of the jury instruction to reduce that speculation to a minimum." *Carter* v. *Kentucky,* 450 U.S. 288, 303, 101 S. Ct. 1112, 67 L. Ed. 2d 241 (1981). We find this reasoning equally apposite to the similar protection against self-incrimination embodied in article first, § 8 of the Connecticut constitution.

5 n.4, citing *Tehan* v. *Shott,* 382 U.S. 406, 409 n.3, 86 S. Ct. 459, 15 L. Ed. 2d 453 (1966). Thus, because this case was not final when the *Carter* v. *Kentucky* rule was announced, the trial court erred in failing to give the "no-adverse-inference" instruction as the defendant had requested.

On appeal, the state does not contend that the trial court did not err. Rather, the state argues that the defendant's cause was not harmed by the error and that the conviction therefore should not be reversed.

Initially, we note that there is some question as to whether an error of this sort can ever be considered harmless. In *Carter* v. *Kentucky,* supra, 304, the United States Supreme Court specifically declined to decide whether a violation of the rule it announced there could ever be considered harmless error: "While it is arguable that a refusal to give an instruction similar to the one that was requested here can never be harmless . . . we decline to reach the issue, because it was not presented to or considered [below] by the Supreme Court of Kentucky." Although the question is one of significant legal import, we need not decide it in this case. Even if harmless error might be appropriate in such cases, our review of the record in this case leads to the conclusion that the state has not proved beyond a reasonable doubt that the trial court's error in failing to give the "no-adverse-inference" instruction was harmless.

The United States Supreme Court has recognized that certain constitutional protections are so central to the requirement of a fair trial that their violation absolutely requires that the conviction from which they arose be set aside. *Chapman* v. *California,* 386 U.S. 18, 23, 87 S. Ct. 824, 17 L. Ed. 2d 705, reh. denied, 386 U.S. 987, 87 S. Ct. 1283, 18 L. Ed. 2d 241 (1967). In some circumstances, however, violations of other,

less basic constitutional rights may be considered harmless and therefore do not compel reversal. Id., 23–24. "If error touches a less basic constitutional right, we sometimes apply the 'harmless error' exception, but only sparingly, in a few, discrete circumstances. *State* v. *Zeko,* 177 Conn. 545, 558, 418 A.2d 917 (1979). In such circumstances we require the state to prove the error harmless beyond a reasonable doubt. *State* v. *Sorbo,* 174 Conn. 253, 257, 386 A.2d 221 (1978); *Aillon* v. *State,* 168 Conn. 541, 547–48, 363 A.2d 49 (1975)." *State* v. *Truppi,* 182 Conn. 449, 465–66, 438 A.2d 712 (1980), cert. denied, 451 U.S. 941, 101 S. Ct. 2024, 68 L. Ed. 2d 329 (1981).[7]

Here, the error may be held harmless only if the evidence against the accused is so overwhelming that we can conclude as a matter of law that the jury's verdict was not influenced by the absence of a "no-adverse-inference" instruction.[8] *United States* v. *Hasting,* 461

---

[7] If the trial court's error does not implicate constitutional protections the burden of establishing harm sufficient to warrant reversal rests with the appellant. *State* v. *Brown,* 187 Conn. 602, 611, 447 A.2d 734 (1982); *State* v. *Truppi,* 182 Conn. 449, 465, 438 A.2d 712 (1980), cert. denied, 451 U.S. 941, 101 S. Ct. 2024, 68 L. Ed. 2d 329 (1981); *State* v. *Cooper,* 182 Conn. 207, 212, 438 A.2d 418 (1980); *State* v. *Ruth,* 181 Conn. 187, 197, 435 A.2d 3 (1980); *State* v. *Dolphin,* 178 Conn. 564, 572, 424 A.2d 266 (1979); *State* v. *Pepe,* 176 Conn. 75, 81, 405 A.2d 51 (1978).

[8] The dissent would find that the court's error in failing to give the "no-adverse-inference" instruction was harmless because the defendant's account of the incident was presented to the jury through the testimony of defense psychiatric experts, thereby leaving nothing to be inferred by the jury. The "no-adverse-inference" instruction, however, is designed to protect against a broader sort of juror prejudice than the dissent would recognize. Absent instructions to the contrary, jurors are left free to speculate about the reasons behind a defendant's failure to take the stand and protest his innocence. That speculation may give rise to inferences not only about the defendant's account of the incident, but also about more general matters including character and veracity.

In this instance, as the dissent recognizes, the defendant indirectly put his account of the incident to the jury through the experts' testimony. The jury might well have inferred from his failure to testify before them directly and to submit to cross-examination some absence of credibility. If so, his

U.S. 499, 103 S. Ct. 1974, 76 L. Ed. 2d 96 (1983); *Harrington* v. *California,* 395 U.S. 250, 89 S. Ct. 1726, 23 L. Ed. 2d 284 (1969). *Chapman* v. *California,* supra; *Fahy* v. *Connecticut,* 375 U.S. 85, 86–87, 84 S. Ct. 229, 11 L. Ed. 2d 171 (1963); *State* v. *Truppi,* supra. As noted above, the defendant did not testify at trial. His account of the incident was introduced, however, through the testimony of the five psychiatrists who evaluated his emotional state and testified as to their conclusions. Four of them testified that the defendant was legally insane at the time of the shooting; only one, the state's witness, concluded that the defendant was legally sane. Although the five psychiatrists have similar and equally impressive credentials,[9] it appears that the jury chose to believe the conclusion of the state's witness. We cannot conclude that the jury found all four of the defendant's expert witnesses to be without credibility. The more logical conclusion is that the jury did not believe the representations made by the defendant to those psychiatrists about his mental state on the night of the shooting.

Because the defendant's credibility was a central concern of the jury it was particularly important that the jury assess his claim without prejudice. The very reason for the "no-adverse-inference" instruction established in *Carter* v. *Kentucky* is to counteract what is

entire defense was substantially prejudiced. The trial court should have alleviated the potential for such prejudice by giving the "no-adverse-inference" instruction as the defendant requested.

[9] The four expert witnesses for the defense on this issue were: Dr. Ernst Prelinger, who holds a Ph.D in clinical psychology and is currently employed by Yale University, in the University Health Service; Dr. Meyer M. Shimelman, a licensed psychiatrist currently an assistant professor of psychiatry at Yale University; Dr. Thomas F. Hersey, a licensed, practicing psychiatrist for more than thirty years; and Dr. Ellis A. Perlswig, a licensed, practicing psychiatrist and an instructor of psychiatry at Yale University. The state's expert witness was Dr. Howard Zonana, a licensed psychiatrist currently an associate clinical professor of psychiatry at Yale University.

perceived as a juror's tendency to prejudge a defendant because he failed to take the stand and protest his innocence.

The defendant admitted to some of the psychiatrists that he went to the Baldwin Drive area with a general intent to kill. The state argues that the jury therefore found his claim that he was sent into an uncontrollable psychotic rage by observing the victims' sexual activity inherently unbelievable. It may well be that the jury did not accept the defendant's insanity claim for that reason. Given the circumstances of this case, however, the state has not shown beyond a reasonable doubt that a properly instructed jury would have done likewise. The failure to give a "no-adverse-inference" instruction constitutes reversible error.

## II

On November 2, 1976, the defendant filed a pretrial motion for disclosure and production by the state of certain information. Included therein was a request for the disclosure of "[a]ny and all exculpatory information and material" known to the state's attorney. The state responded that it had no knowledge of any exculpatory information. The defendant claims on appeal that a police report of March 27, 1975, which state's attorney Markle did not disclose, did contain exculpatory information, and that reversal of his conviction is therefore required.

The defendant filed a pretrial notice of his intent to rely, inter alia, on a defense of lack of criminal responsibility by reason of mental disease or defect. See Practice Book § 758. Thus, it was incumbent upon the defendant to introduce some evidence tending to show that he, "at the time of the proscribed conduct, as a result of mental disease or defect lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements

of law." General Statutes (Rev. to 1975) § 53a-13.[10] Under this version of the statute, once the defendant introduced sufficient evidence to put his sanity in doubt, it became the state's burden to prove that at the time of the crime the defendant had the capacity both to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of law. *State* v. *Ontra,* 178 Conn. 480, 482–83, 423 A.2d 134 (1979); *State* v. *Rossier,* 175 Conn. 204, 209, 397 A.2d 110 (1978); *State* v. *Holmquist,* 173 Conn. 140, 150, 376 A.2d 1111, cert. denied, 434 U.S. 906, 98 S. Ct. 306, 54 L. Ed. 2d 193 (1977); *State* v. *Roy,* 173 Conn. 35, 44, 376 A.2d 391 (1977); *State* v. *Davis,* 158 Conn. 341, 355, 260 A.2d 587 (1969).

As mentioned earlier, the thrust of the defense was that the defendant suffered from a mental disease and that this disease caused his behavior on the night of the shooting. The defendant's claim, made through the testimony of defense psychiatrists, was that his observation of apparent sexual activity in Lawry's car caused his disease to manifest itself in an uncontrollable psychotic rage.

Each of the defendant's expert witnesses testified that his evaluation of the defendant's mental state at the time of the shooting was based on the defendant's recollections of the incident, as revealed during individual psychiatric examinations. The defendant's account of the shooting was thereby placed before the jury, under proper instruction from the trial court that it could be considered "as evidence bearing on the basis of [the witness'] opinion and not on the issue of whether [the defendant] did commit the act or acts."

It is clear from all the evidence that the defendant drove to the Baldwin Drive area armed with a .22 caliber rifle. While parked there he observed the Lawry

---

[10] See footnote 4, supra.

vehicle for some time. According to the defendant, he then observed the Lawry car begin to shake. He contended that this stimulus set off a psychotic reaction causing him to approach the car with a rifle. Upon looking inside the car he observed the couple in an apparent act of intercourse and, either because he was further stimulated by this observation or because his existing psychotic state was thereby perpetuated, he began shooting at them.

Dr. Ernst Prelinger testified that at the time of the shooting the defendant was "in a quite agitated state" brought about by "his need to eradicate anything sexual." On cross-examination by the state's attorney, Dr. Prelinger testified that the defendant had told him that he saw the Lawry car shaking on the night in question and that the couple's apparent sexual activities "set him off."

Dr. Meyer Shimelman testified to his evaluation of the defendant as a chronic paranoid schizophrenic. On cross-examination, Dr. Shimelman testified that the defendant had told him that on the night of the shooting he had observed "some rocking motion back and forth" in the Lawry car. When the defendant approached the car he saw the couple engaged in intercourse at which point, according to the witness, he "became totally psychotic" and began shooting at the couple.

Dr. Ellis A. Perlswig testified that based upon his examinations he diagnosed the defendant as having "schizophrenic reaction, paranoid type." In response to the state's attorney's cross-examination, Dr. Perlswig related that the defendant was "set off" by having seen the Lawry car shaking, that he then approached the car and shot the boy "to get the boy off" the girl; he did this so that he could shoot the girl, the intended target of his rage.

In rebuttal, the state did not seriously contest the defendant's claim that he suffered from some form of mental disease or defect. Instead, the state introduced testimony designed to show that the shooting was a deliberate and willful act, rather than the result of an uncontrollable psychotic rage. It did this both by expert testimony concerning the defendant's mental state, and by challenging the defendant's rendition of the circumstances surrounding the shooting.

The state's expert psychiatric witness, Dr. Howard Zonana, testified that the defendant's personality is primarily antisocial "with schizoid features which may be progressing towards . . . simple schizophrenia." Dr. Zonana concluded, however, that the shooting was "conscious and planned" and that the defendant did not lack the capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law. Dr. Zonana also testified that the defendant had admitted to him that he went to the Baldwin Drive area on the night in question intending to kill someone.

The state also used the testimony of Steven Lawry to prove that the shooting was a premeditated and deliberate act and to rebut the defendant's claim that it was his observation of apparent sexual activity in Lawry's car that caused him to lose control of his actions. The critical evidence in this respect was Lawry's testimony about the events leading up to the shooting.

On direct examination for the state Lawry testified that he and his companion had arrived at Baldwin Drive about 7:45 p.m. on March 22, 1975. Lawry parked the car in a wooded area on a dirt road off Baldwin Drive. Lawry testified that shortly after parking the car he and his companion engaged in sexual intercourse. He

stated that the shooting occurred approximately a half-hour to forty-five minutes after they first parked the car.

In response to cross-examination Lawry delineated the events more specifically. He testified that the couple had completed intercourse approximately fifteen minutes before the first shot was fired and that both he and his companion were seated upright in the front seat when the first shot rang out.

Thus, there was an obvious important discrepancy between Lawry's account of the incident and the defendant's. The substance of the defendant's claim was that he observed apparent sexual activity in the Lawry vehicle, and that this "set off" his rage. Although none of the defense psychiatrists could state the amount of time that elapsed between the defendant's observation of sexual activity and his approach to the Lawry car, the defendant's claim would appear inconsistent with Lawry's testimony that he and his companion had completed intercourse fifteen minutes before the first shot was fired. More importantly, Lawry's testimony that he and his companion were seated upright in the car when the shooting began was totally incompatible with the defendant's statement that the couple were lying prone and apparently embracing when he arrived at the side of the car.

This crucial factual discrepancy cannot be overlooked. If the jury believed Lawry's trial testimony about the events leading up to the shooting they would necessarily disbelieve the defendant's version of those events. His defense thus would be substantially weakened.[11]

---

[11] In its brief the state argues that any discrepancy about objective facts would not damage the defendant's cause because the jury's focus where insanity is raised as a defense is not on objective reality but on the credibility of the defendant's assertions of his subjective perception of reality. The relevance and materiality of any evidence, however, depends on the circumstances of the particular case. Here, the defendant claimed that he

If, on the other hand, the jury found the defendant's representations to be accurate, they might reasonably have found, based on testimony as to his instability in general, that this stimulus caused him to lose the capacity to appreciate the consequences of his behavior or to conform his behavior to the requirements of the law.

It is important to note that Lawry's testimony about the events on Baldwin Drive went largely unrebutted. His responses to questions of both counsel did not suggest any uncertainty about his recollection nor did he indicate that he had ever remembered or recounted the events differently. In fact, Lawry responded in the negative when asked by the defense at trial if he had "given the police any other statements" after March 24, 1975.[12]

It was not until long after the trial ended, when the defendant appealed, that a police report of an interview with Lawry was disclosed which contained crucial inconsistencies with his trial testimony.

Sergeant Lawrence Peryer of the Hamden police department was a member of the police investigating team and testified for the state at trial. The bulk of Peryer's testimony concerned his interviews of the defendant. Although Peryer had interviewed Lawry at Yale-New Haven Hospital on at least four occasions, for reasons that later became obvious Peryer was never questioned about that aspect of the investigation by the state's attorney.

---

was in control of his behavior until observing apparent sexual activity. Although the jury might still believe his claim of insanity if it found that no sexual activity was apparent, his claim is made much more plausible if his version about the stimulus of his psychotic rage were found to be true. Thus we cannot agree that the discrepancies were necessarily immaterial.

[12] Given that Lawry probably had never been instructed about the narrow definition of the term "statement" found in Practice Book § 749; see footnote 14, infra; it is likely that the defendant and the jury interpreted his answer to mean that he had not given any other account of the incident beyond his formal statement of March 24, 1975.

At the conclusion of the direct examinations of both Lawry and Peryer the state turned over to the defense statements that each witness had made that were in the state's attorney's possession and that related to the subject matter about which each had testified. Practice Book § 752.[13] After being given certain statements made by Peryer the defendant's attorney informed the court of his belief that certain other statements made by Peryer had not been turned over. The state's attorney did not dispute that claim. Rather, he argued that Practice Book § 752 requires that only those statements relating to the subject matter about which the witness has testified must be produced. He stated that any other statements of Peryer did not relate to his testimony on direct examination. Defense counsel took the position that all statements made by the witness must be surrendered.

After receiving briefs and hearing argument on that question the trial court ruled in agreement with the state's position that only those statements relating to the subject matter about which the witness had testified must be produced. The trial court reviewed in camera all of Peryer's statements that the state possessed and ordered that under Practice Book § 752 none need be surrendered other than those that the state originally offered. The remainder of Peryer's statements were sealed by order of the trial court and marked as exhibit UU for identification. Practice Book § 753.[14]

[13] "[Practice Book § 752]: PRODUCTION FOLLOWING TESTIMONY

"After a witness called by the state has testified on direct examination at trial, the judicial authority shall, on motion of the defendant, order the state to produce any statement of the witness in the possession of the state or its agents, including state and local law enforcement officers, which statement relates to the subject matter about which the witness has testified."

[14] "[Practice Book § 753]: DELIVERY AND EXCISION OF STATEMENTS

"If the entire contents of a statement requested under Sec. 752 relate to the subject matter of the testimony of the witness, the judicial authority shall order the statement to be delivered directly to the defendant or his counsel for his examination and use. If the prosecuting authority claims

On November 15, 1982, after the defendant had filed his appeal from the conviction he made a motion to the trial court to disclose exhibit UU as clearly allowed by Practice Book § 753. The trial court granted the defendant's motion over *objection by the state's attorney.*

Exhibit UU contained several statements by Peryer concerning interviews with Lawry that occurred shortly after the shooting. One such statement, dated March 27, 1975, forms the basis for the defendant's claim that the state improperly withheld exculpatory evidence. That police report states that during an interview conducted at 10 a.m. that day *Lawry told Peryer that he and his companion were kissing in a prone position on the front seat of his car when the shooting began.* The defendant claims on appeal that because that statement supports the defendant's account of the incident and bears on the credibility of a key prosecution witness who disputed the defendant's recollections, it is material evidence favorable to the defendant and the state's failure to surrender the statement constitutes reversible error.[15]

that any statement ordered to be produced under Sec. 751 contains matter which does not relate to the subject matter of the testimony of the witness, the judicial authority shall order the prosecuting authority to deliver such statement for the inspection of the judicial authority in camera. Upon such delivery, the judicial authority shall not disclose that portion of such statement which does not relate to the subject matter of the testimony of the witness. With such material excised or obliterated, the judicial authority shall then direct delivery of such statement to the defendant or his counsel for his use. If, pursuant to this procedure, any portion of such statement is withheld from the defendant or his counsel and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be sealed and preserved as an exhibit in the case, and, in the event that the defendant appeals, it shall be made available to the appellate court and, unless for good cause the trial court orders otherwise, to counsel for the parties for the purpose of determining the correctness of the ruling of the judicial authority."

[15] The defendant also claims error in the trial court's failure to order disclosure of Lawry's statement under Practice Book § 752, either after Lawry testified or after Peryer testified. Section 752 requires disclosure of "any

In *Brady* v. *Maryland,* 373 U.S. 83, 86–87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the United States Supreme Court held that the prosecution's failure to disclose a codefendant's statement that exculpated the defendant after the defendant had specifically requested that statement constituted a violation of the defendant's due process right under the fourteenth amendment.[16] "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id., 87; see *State* v. *Altrui,* 188 Conn. 161, 177, 448 A.2d 837 (1982); *State* v. *Moynahan,* 164 Conn. 560, 593, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973).

---

statement of the witness . . . which . . . relates to the subject matter about which the witness has testified." Practice Book § 749 defines a "statement" as "[a] written statement made by a person and signed or otherwise adopted or approved by him" or "[a] stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement." See *United States* v. *Carrasco,* 537 F.2d 372, 376 (9th Cir. 1976). Here, Lawry did not adopt Peryer's report as his own nor did the report purport to be a verbatim recital of Lawry's statement. The report therefore was not discoverable at the close of Lawry's testimony. *Goldberg* v. *United States,* 425 U.S. 94, 110 n.19, 96 S. Ct. 1338, 47 L. Ed. 2d 603 (1976). Although the report clearly was a statement by Peryer, its contents did not relate to the subject matter of Peryer's testimony on direct examination because the state's attorney did not question him about that aspect of his investigation. A nexus between the subject matter of a witness' statement and his or her trial testimony is clearly required by § 752. See note, "Defendant Access to Prosecution Witness Statements in Federal and State Criminal Cases," 61 Wash. Univ. L. Q. 471, 483 (1983). Thus, Peryer's report was not discoverable under Practice Book § 752.

[16] Because the prosecution's duty to disclose exculpatory information stems from the due process clause of the fourteenth amendment to the United States constitution, the disclosure rule announced in *Brady* v. *Maryland,* 373 U.S. 83, 86–87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), applies to all the individual states. A similar, independent right exists under the

The United States Supreme Court further explained and refined the rule set forth in *Brady* v. *Maryland,* supra, in the case of *United States* v. *Agurs,* 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). There the court identified three distinct situations to which the *Brady* rule might apply: (1) those cases in which "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury"; *United States* v. *Agurs,* supra, 103; (2) those cases, like *Brady* itself, in which the defendant has made a pretrial request for specific evidence; *United States* v. *Agurs,* supra, 104; and (3) those cases in which the defendant has made no request for disclosure or has made only a general request for all exculpatory information. Id., 107.

Both *Brady* and *Agurs* unequivocally command that evidence that is favorable to the accused and that is material to the issue of guilt or punishment must be disclosed by the prosecution. The principal distinction among the paradigms set out in *Agurs* is the standard that is used to determine whether the undisclosed evidence is material in each instance. Where the prosecution employs perjured testimony (the first paradigm) the conviction "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States* v. *Agurs,* supra, 103. Under the second paradigm, (where a specific request is made) the undisclosed evidence is considered material if its disclosure "might have affected the outcome of the trial." Id., 104. In those cases where the defendant has not specifically requested disclosure of the evidence in question, (the third paradigm) the standard is even higher. There, in order to

due process provision of the Connecticut constitution. Conn. Const., art. I, § 8. *Michigan* v. *Long,* 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983); *State* v. *Ferrell,* 191 Conn. 37, 45 n.12, 463 A.2d 573 (1983).

compel reversal of his conviction, the defendant must show that "the omitted evidence creates a reasonable doubt that did not otherwise exist." Id., 112.

Given that the undisclosed police report is, as the state concedes, favorable to the defendant, the only question before us is one of materiality. *State* v. *Moynahan,* supra. On review of the record we find that the state's attorney's conduct in this case falls within the first *Agurs* paradigm of prosecutorial misconduct. In applying the corresponding materiality test we find that the evidence which the state's attorney did not disclose "could have affected the judgment of the jury." *United States* v. *Agurs,* supra.

We first note that although Lawry's trial testimony about the couple's posture differed significantly from that which appeared in Peryer's report, we cannot say from the record before us that his testimony constituted perjury, as that term is defined by statute.[17] During other police interviews Lawry recounted the event in a manner consistent with his trial testimony. None of the other evidence introduced at trial necessarily refutes his testimony. Furthermore, although Lawry's response on cross-examination that he had made no other statements to the police is likely to have misled both the defendant and the jury, his testimony was literally accurate. His recollections of the shooting contained in Peryer's report of March 27, 1975, were not his own "statement" as that term is defined in Practice Book § 749.[18] Thus, we cannot say that Lawry committed perjury through intentional false testimony. See General Statutes § 53a-156 (a).

---

[17] The statutory crime of perjury is defined in General Statutes § 53a-156 (a): "A person is guilty of perjury if, in any official proceeding, he intentionally, under oath, makes a false statement, swears, affirms or testifies falsely, to a material statement which he does not believe to be true."

[18] See footnote 15, supra.

The responsibility of the state's attorney to conduct the prosecution in accordance with constitutional fair trial standards, however, cannot be defined or limited by the precise contours of the perjury statute. When Lawry testified on cross-examination the state's attorney knew or should have known that Lawry's prior statement to Peryer varied significantly on certain crucial issues. Although a state's attorney has no absolute duty under the constitution to disclose every prior inconsistent statement of a state's witness; *Moore* v. *Illinois*, 408 U.S. 786, 795, 92 S. Ct. 2562, 33 L. Ed. 2d 706, reh. denied, 409 U.S. 897, 93 S. Ct. 87, 34 L. Ed. 2d 155 (1972); when Lawry testified that he had made no prior statements to the police the state's attorney surely knew that the jury would then infer that Lawry's recollection of the incident had remained constant. In failing to disclose Peryer's report at that point the state's attorney knowingly allowed the jury to be presented with a false and misleading picture that Lawry was consistent on this critical issue.

In explaining the first paradigm in *Agurs* the United States Supreme Court noted that its "strict standard of materiality" should be applied where prosecutorial misconduct creates "a corruption of the truth-seeking function of the trial process." *United States* v. *Agurs,* supra, 104. The references in *Agurs* to "perjured" testimony must be taken to include testimony known to the state's attorney to be false or misleading even if the witness may not have such an awareness. Here, the state's attorney's actions in failing to disclose Peryer's report corrupted the trial process and denied the defendant his constitutional right to a fair trial[19]

---

[19] Although we rely on the United States Supreme Court's interpretation of the federal constitutional fair trial right in our analysis, our decision is based on both the fair trial right contained in the sixth amendment to the United States constitution and applied to the states by the fourteenth amendment and, independently, on the fair trial right guaranteed by arti-

just as surely as if the state's case included perjured testimony. "As long ago as *Mooney* v. *Holohan,* 294 U.S. 103, 112 [55 S. Ct. 340, 79 L. Ed. 791] (1935), this Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.' This was reaffirmed in *Pyle* v. *Kansas,* 317 U.S. 213 [63 S. Ct. 177, 87 L. Ed. 214] (1942). In *Napue* v. *Illinois,* 360 U.S. 264 [79 S. Ct. 1173, 3 L. Ed. 2d 1217] (1959), we said, '[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.' *Id.,* at 269." *Giglio* v. *United States,* 405 U.S. 150, 153, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).

Our decision that the state's attorney's misconduct in prosecuting this case compels a new trial is not only based on constitutional principles. Under our inherent supervisory authority we may set aside a conviction and order a new trial where the original trial was tainted by prosecutorial misconduct.

"An appellate court has a 'certain inherent supervisory authority over the administration of justice'; *United States* v. *Butler,* 567 F.2d 885, 893 (9th Cir. 1978); in the trial courts below that permits action to deter prosecutorial misconduct which is 'unduly "offensive to the maintenance of a sound judicial process."' (Citation omitted.) *People* v. *Swan,* 56 Mich. App. 22, 31–32, 223 N.W.2d 346 (1974); see, e.g., *United States* v. *Payner,* 447 U.S. 727, 735 n.7, 100 S. Ct. 2439, 65 L. Ed. 2d 468, reh. denied, 448 U.S. 911, 101 S. Ct. 25, 65 L. Ed. 2d 1172 (1980); *United States* v. *Capone,* 683 F.2d 582, 586 (1st Cir. 1982); *United States* v. *Nembhard,* 676 F.2d 193, 199 (6th Cir. 1982); *United States* v. *Butler,* supra, 890; *United States* v. *Keogh,* 391 F.2d 138, 148 (2d Cir. 1968); *State* v. *Farrell,* 61

cle first, § 8 of the Connecticut constitution. See *Michigan* v. *Long,* 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983); *State* v. *Ferrell,* 191 Conn. 37, 45 n.12, 463 A.2d 573 (1983).

N.J. 99, 104, 293 A.2d 176 (1972); *State* v. *Stewart,* 162 N.J. Super. 96, 99, 392 A.2d 234 (1978); *State* v. *Bartlett,* 96 N.M. 415, 418, 631 P.2d 321 (1981); *Commonwealth* v. *Virtu,* 495 Pa. 59, 68–69, 432 A.2d 198 (1981). . . . This court . . . has long been of the view that it is ultimately responsible for the enforcement of court rules in prosecutorial misconduct cases. *State* v. *Ferrone,* 97 Conn. 258, 270, 116 A. 336 (1922). Upsetting a criminal conviction is a drastic step, but it is the only feasible deterrent to flagrant prosecutorial misconduct in defiance of a trial court ruling." *State* v. *Ubaldi,* 190 Conn. 559, 570–71, 462 A.2d 1001, cert. denied, 462 U.S. 1001, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983).

The trial court had ordered disclosure of all exculpatory material in the state's possession. The state responded that it had none. Yet, one of the first investigative reports filed was Peryer's report of March 27, 1975, which contained Lawry's recollection that he and his companion were in a prone position when the first shot was fired. Because the exact nature of the defendant's claim was not yet known, this statement was not obviously exculpatory at the time the trial court ordered disclosure of exculpatory material, and the state's attorney's decision not to disclose it *at that time* plays no part in our decision. The state, however, has a continuing duty to disclose exculpatory information. Practice Book §§ 734 and 741. The state's attorney's subsequent trial tactics made manifest the exculpatory nature of Peryer's report.

On the critical issue of whether the defendant was legally sane at the time of the shooting, the state squarely cast the issue in terms of a credibility contest. The state used Lawry's recollection of the incident to rebut the defendant's insanity claim. At closing argument the state's attorney argued that the evidence showed that the defendant went to Baldwin Drive on March 22, 1975, knowing that Lawry and his compan-

ion would be there and specifically intending to kill both. He emphasized the discrepancy between Lawry's in-court account of the events leading up to the shooting and the defendant's account as support for the state's claim. Three times during his closing argument the state's attorney called the jury's attention to Lawry's trial testimony that the couple had completed inter-course fifteen minutes before the shooting and that they were seated upright smoking cigarettes when the shots began. In response to the defendant's claim that the couple were lying prone on the front seat when he approached the car, state's attorney Markle argued: "Now, we know from Lawry that's a lie because they were just sitting there having a cigarette. To believe him you would have to disbelieve Lawry, and I submit that he [the defendant] isn't worthy of belief." This was the same state's attorney who withheld the police report that substantiated the defendant's version.

Viewed together with his later actions, the state's attorney's failure to disclose Lawry's prior inconsis-tent statement, which clearly supported the defendant's version of the incident and which was not otherwise discoverable, cannot be attributed to mere overzealous-ness. His exploitation at final argument of the very crucial discrepancy that his intransigence exacerbated cannot be condoned or tolerated. By imploring the jury to believe Lawry's testimony on this issue over the con-flicting testimony of the defendant, while at the same time withholding from both the defendant and the jury evidence that was crucial to that issue, the state's attor-ney deliberately impeded the truth seeking process of trial.

"[The state's attorney] is not only an officer of the court, like every attorney, but is also a high public offi-cer, representing the people of the State, who seek impartial justice for the guilty as much as for the inno-cent. In discharging his most important duties, he

deserves and receives in peculiar degree the support of the court and the respect of the citizens of the county. By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused be guilty, he should none the less be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe." *State* v. *Ferrone,* 96 Conn. 160, 168–69, 113 A. 452 (1921).

The state's attorney owes a duty to *all* the people. While our system of adversarial justice demands vigorous advocacy from both the prosecution and defense counsel, the state's attorney must never become the "architect of a proceeding that does not comport with standards of justice." *Brady* v. *Maryland,* supra, 88. "Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." Id., 87. The principle of fairness on which our justice system depends must be guarded vigilantly.

The misconduct of the state's attorney in failing to disclose evidence favorable to the accused constitutes reversible error independent of and in addition to the trial court's failure to instruct the jury properly.

There is error, the judgment is set aside, and a new trial is ordered.

In this opinion PARSKEY, SHEA and GRILLO, Js., concurred.

COVELLO, J., dissenting. I respectfully disagree with the well stated position adopted by the majority.

## "No-Adverse-Inference" Instruction

Although the court's failure to give the "no-adverse-inference" instruction to the jury now constitutes error by reason of the later holding in *Carter* v. *Kentucky,* 450 U.S. 288, 101 S. Ct. 1112, 67 L. Ed. 2d 241 (1981), I find such error to be harmless beyond a reasonable doubt.

An inference is the product of a mental process whereby one derives through reasoning the existence of unknown facts as the logical consequence of other facts which are already proven or known.[1] A fundamental aspect of this mental process is the proposition that the facts being inferred are otherwise unknown. If facts are known through direct perception, there is no need to derive or deduce their existence through inferential reasoning.[2]

Within the context of a criminal prosecution the proposition or fact being inferred by a jury which has not been instructed to the contrary, is the unknown content of an accused's testimony. The jury infers by an accused's silence that his version of the facts, if expressed, would be similar to or corroborative of the version offered by the state and thereby supportive of his guilt. It is these negative implications of an accused's silence which run counter to the constitutional presumption of innocence and the right to remain silent which requires that guilt be proved by facts and not the absence of them.

---

[1] R. Bradley & N. Swartz, Possible Worlds, An Introduction to Logic and Philosophy, p. 194 (1979); H. Leonard, Principles of Right Reason, p. 64 (1957); R. Neirdorf, Deductive Forms, p. 3 (1967); R. Olson, Meaning and Argument/Elements of Logic, p. 173 (1969); see generally K. Lambert & W. Ulrich, The Nature of Argument, pp. 30–33 (1980).

[2] W.H.V. Reade, The Problem of Inference, p. 5 (1938).

If, however, an accused's testimony is in fact known to the jury, his silence implies nothing. The jurors know what his version of the facts is and therefore there is no need for them to infer its content.

In the present case, the accused's version of the facts was placed before the jury by no less than five psychiatrists who testified concerning his sanity. It does not matter for what purpose it was introduced. The fact remains that the accused's account was fully known to the jury. Therefore, there was no need to derive anything through the use of the inferential process and the accused's silence could therefore mean nothing. This being the case, any instruction to the jury about inference drawing, although legally required, was simply inapplicable to the fact finding circumstance which confronted the jury. As there was no need to infer anything, I would find the omission of the "no-adverse-inference" instruction to be harmless error beyond a reasonable doubt.

## WITHHELD INFORMATION

No matter which of the *Agurs*[3] paradigms is adopted, a threshhold consideration must be the admissibility of the withheld information to impeach the testimony of Steven Lawry. If inadmissible, it is clearly not material in either an evidential or constitutional sense.

I submit that the information was not admissible for the reason that it was not Lawry's statement.[4] Lawry had never signed the Case/Incident Report, nor is there any evidence that he had otherwise "adopted

---

[3] *United States* v. *Agurs*, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976).

[4] Not only was it not Lawry's statement, it was also not Peryer's statement. Neither had ever signed it. As a matter of fact, it may not have been Peryer's summary of the interview as the content of the narrative discloses that there was more than one investigator present at the time the synopsis was made.

or approved" of it.[5] It is "grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations and interpolations." *Palermo* v. *United States*, 360 U.S. 343, 350, 79 S. Ct. 1217, 3 L. Ed. 2d 1287 (1958).

Since there was no evidence that Lawry had ever adopted or approved these comments, the trial court correctly excluded the Case/Incident Report relying on the proposition that "[t]he officer's account of the conversation is not subject to disclosure . . . unless it is found to have been adopted or approved by the witness . . . ." *State* v. *Anonymous (83–FG)*, 190 Conn. 715, 734, 463 A.2d 533 (1983).

I would therefore find no error.[6]

---

[5] Practice Book § 749 states in relevant part:

"The term 'statement' . . . means:

"(1) A written statement made by a person and signed or otherwise adopted or approved by him; or

"(2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement."

Section 749 (2) above is clearly inapplicable as an examination of the Case/Incident Report discloses that the summary is not intended as a verbatim recital of anything.

[6] At the very least, before ordering a retrial of a homicide that took place on March 22, 1975, over nine years ago, I would order an inquiry into the circumstances of the interview in question to allow the trial court to gather extrinsic evidence bearing on the extent to which the document is producible. *Goldberg* v. *United States*, 425 U.S. 94, 108–109, 96 S. Ct. 1338, 47 L. Ed. 2d 603 (1976); *Campbell* v. *United States*, 365 U.S. 85, 98–99, 81 S. Ct. 421, 5 L. Ed. 2d 428 (1961) *(Campbell I);* see also *Campbell* v. *United States*, 373 U.S. 487, 489, 493, 83 S. Ct. 1356, 10 L. Ed. 2d 501 (1963) *(Campbell II)*.