# STATE OF CONNECTICUT *v.* MICHAEL T.*
## (SC 20230)

McDonald, D'Auria, Mullins, Ecker, Keller and Vertefeuille, Js.

*Syllabus*

Pursuant to statute (§ 54-84 (b)), "[u]nless the accused requests otherwise, the court shall instruct the jur[ors] that they may draw no unfavorable inferences from the accused's failure to testify."

Convicted of multiple counts of first degree sexual assault and risk of injury to a child in connection with the sexual abuse of the victim, the daughter of his girlfriend, the defendant appealed to this court. The victim, who

---

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

State *v.* Michael T.

was eleven years old at the time of trial, was reluctant to testify about the sexual assaults. On direct examination, the victim indicated that the defendant had hurt her "private" with "[h]is private." Shortly thereafter, the prosecutor reworded the victim's testimony and referred to the victim's testimony that the defendant had "put his private in [the victim's] private." In response to a question about whether anything had come out of either her private or the defendant's private, the victim responded that blood had come out of "[h]is" private, but the prosecutor subsequently referred to the blood that came out of the victim's, not the defendant's, private parts. The defendant did not testify at trial, and defense counsel requested that the trial court instruct the jury that the defendant "elected not to testify" rather than use the specific language in § 54-84 (b) regarding his "failure to testify," which counsel claimed has a negative connotation and suggested that the defendant had an obligation that he did not fulfill. The trial court denied counsel's request, indicating that its failure to use the statutory language might constitute plain error. The trial court subsequently instructed the jury that it could draw no unfavorable inference from the defendant's failure to testify. On appeal, the defendant claimed that he was denied his due process right to a fair trial by virtue of certain improprieties the prosecutor made while questioning the victim and during closing and rebuttal arguments. The defendant also challenged the trial court's jury instruction regarding his "failure" to testify. *Held*:

1. There was no merit to the defendant's claim that the prosecutor improperly relied on facts not in evidence by referring to the victim's testimony that the defendant had "put his private in [the victim's] private" and that blood had come out of her private: although it would have been preferable for the prosecutor to ask the victim clarifying questions rather than rephrase her words to correct the victim's plainly mistaken testimony, the prosecutor's statement that the defendant penetrated the victim was a reasonable and necessary inference drawn from the victim's testimony that the defendant had hurt her private with his private, the victim expressly testified on redirect examination that the defendant's private went into her private, and defense counsel did not object to the prosecutor's questions rephrasing the victim's testimony or contest the ample evidence that the victim had suffered a traumatic penetrating injury, contending only that the defendant was not the perpetrator; moreover, the salient point of the victim's testimony was the presence, not the source, of blood in her genital area after the assault, and the jury could reasonably infer that, at her young age, the victim simply did not know the source of the blood; furthermore, in light of the victim's age and reluctance to testify, it was within the trial court's discretion to allow the use of leading questions during the prosecutor's examination of the victim, and the prosecutor's remarks rephrasing the victim's testimony were not significantly more suggestive of independent knowledge of facts than a leading question would have been or deliberately

State *v.* Michael T.

intended to distort the victim's testimony or to suggest that the prosecutor had knowledge of facts that could not be presented to the jury.

2. The defendant could not prevail on his claim that the prosecutor engaged in certain improprieties during closing and rebuttal arguments: the prosecutor did not improperly argue facts not in evidence or appeal to the jurors' emotions by thanking the jurors for paying attention to the evidence, apologizing to them for any anxiety the evidence, particularly certain photographs, had caused, and remarking on the difficulty of viewing evidence and hearing testimony of such a nature, as those statements were based on facts in evidence and the reasonable inferences that could be drawn therefrom, defense counsel did not object to those remarks and thanked the jurors during his own closing argument, acknowledging that the case was difficult, emotionally compelling, and "disgusting," and the prosecutor's remark that the state had "tried to keep it to a minimum" was, at most, a comment on the state's effort not to present cumulative evidence rather than a suggestion that the state possessed additional photographic evidence that would strengthen its case; moreover, the prosecutor did not improperly appeal to the jurors' emotions or vouch for the victim's credibility when she asked whether the victim looked like the type of child who would have made up the sexual assault, by characterizing the victim as extremely shy and passive, and by noting that the victim had been tearful and embarrassed during a video-recorded forensic interview, as those remarks were in response to an argument initially raised by the defense, namely, that the victim had lied about the sexual assault allegations because she did not want to live with the defendant, and simply attempted to rebut that argument on the basis of the evidence before the jury of the victim's appearance and demeanor; furthermore, although it was a closer question as to whether the prosecutor improperly vouched for the victim's credibility by asking if her emotions were real, answering that question in the affirmative, and stating that such emotion is hard to fake, in context, those remarks did not improperly induce the jurors to trust the state's judgment in lieu of their own views of the evidence but, rather, referred to evidence that had been presented at trial and appealed to the jurors' common sense and life experiences; furthermore, the prosecutor's comments concerning the victim's injuries to her genital area, namely, that she had been "ripped" and torn without the benefit of pain medication, although approaching an impermissible plea for sympathy, did not materially mischaracterize the testimony of the pediatrician who had examined the victim or exaggerate the severity of the victim's suffering and, therefore, were not improper.

3. The defendant could not prevail on his claim that the trial court improperly denied defense counsel's request that the court deviate from the language of § 54-84 (b) and his alternative claim that § 54-84 (b) is unconstitutional insofar as it violates the constitutional right to remain silent by referring to the defendant's "failure" to testify:

State *v.* Michael T.

a. The trial court did not violate § 54-84 (b) by denying defense counsel's request that it instruct the jury that it could draw no adverse inference from the fact that the defendant elected not to testify: contrary to the defendant's claim that the phrase "[u]nless the accused requests otherwise," as used in § 54-84 (b), required the trial court to give the requested instruction, a review of relevant case law, including *State* v. *Casanova* (255 Conn. 581), revealed that, although a trial court may grant a defendant's request for an instruction that deviates from the specific wording of § 54-84 (b) if the instruction would not materially alter the substantive meaning of the statute, it is not required to grant such a request but may give any instruction that accurately states the law, and, in the absence of a request by a defendant that the court give no instruction concerning the fact that he did not testify, the court's failure to give an instruction pursuant to § 54-84 (b) constitutes plain error; accordingly, although the trial court incorrectly determined that any deviation from the specific wording of § 54-84 (b) would be plain error, and the trial court could have given the instruction that defense counsel requested, as it would not have mischaracterized the defendant's conduct or altered the substantive meaning of the statute, it was not improper for the trial court to instruct the jury using the statute's specific wording; moreover, the defendant's claim that *Casanova* should be overruled was unreviewable, as it was inadequately briefed.

b. This court rejected the defendant's claim that § 54-84 (b) was unconstitutional to the extent that it authorized the trial court to refer to the defendant's "failure" to testify; although this court agreed with the defendant that more neutral language is preferable to the use of the word "failure," which has a relatively negative connotation and tends to confirm the jurors' natural assumption that an innocent person would take the stand to respond to accusations against him, there is no completely neutral way to characterize the fact that the defendant did not take the stand, and the semantic difference between the phrase "failure to testify" and other wordings was too slight to have constitutional significance in the overall context of the instruction in the present case.

(*One justice concurring separately*)

Argued October 14, 2020—officially released April 22, 2021**

*Procedural History*

Substitute information charging the defendant with three counts each of the crimes of sexual assault in the first degree and risk of injury to a child, brought to the Superior Court in the judicial district of New Haven and tried to the jury before *Blue, J.*; verdict and judgment

** April 22, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

State *v.* Michael T.

of guilty, from which the defendant appealed to this court. *Affirmed.*

*Julia K. Conlin*, assigned counsel, with whom was *Emily Graner Sexton*, assigned counsel, for the appellant (defendant).

*Melissa L. Streeto*, senior assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, and *Maxine Wilensky* and *Lisa D'Angelo*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

VERTEFEUILLE, J. A jury found the defendant, Michael T., guilty of three counts of first degree sexual assault in violation of General Statutes § 53a-70 (a) (1) and three counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2). The trial court rendered judgment in accordance with the verdict and sentenced the defendant to a total effective sentence of sixty years imprisonment. The defendant appeals directly to this court pursuant to General Statutes § 51-199 (b) (3), claiming that the prosecutor engaged in prosecutorial impropriety, thereby depriving him of his constitutional due process right to a fair trial, by (1) assuming facts not in evidence while questioning the victim, and (2) during closing argument, assuming facts not in evidence, vouching for the victim's credibility and appealing to the jurors' emotions. The defendant further claims that the trial court violated General Statutes § 54-84 (b)[1] and infringed on his constitutional right to remain silent when it denied his request to instruct the jury that he *elected not* to testify and, instead, referred to his *failure* to testify. We affirm the judgment of conviction.

[1] General Statutes § 54-84 (b) provides in relevant part: "Unless the accused requests otherwise, the court shall instruct the jury that they may draw no unfavorable inferences from the accused's failure to testify. . . ."

State *v.* Michael T.

The record reveals the following facts, which the jury reasonably could have found, and procedural history. The victim was born in December, 2006, and was eleven years old at the time of trial. In 2014 and 2015, when the victim was seven and eight years old, respectively, she lived on Orchard Street in New Haven with her biological mother, her four younger sisters and the defendant. The defendant was the boyfriend of the victim's mother, and the victim referred to him as her "stepfather." On a number of occasions during that period, the defendant called the victim into his bedroom, undressed her,[2] lay her on his bed and penetrated her with his penis vaginally, orally and anally. The defendant told the victim not to tell anyone about the assaults and threatened to kill her if she disobeyed him.

In August, 2015, the victim and her sisters were removed from the Orchard Street residence as the result of an investigation by the Department of Children and Families (department) that was unrelated to the sexual assaults of the victim. The victim and one of her sisters were placed in June Turpin's licensed foster home. After they had been there for several days, Turpin found in their bedroom a pair of the victim's underwear with a clean sanitary napkin stuck to it and another pair of underwear covered in dried blood. Turpin called Quentin Scott, an investigative social worker for the department, who referred Turpin to Cherise Rowan, a physician at the Fair Haven Community Health Center.

Rowan examined the victim on August 27, 2015. The victim denied that she was still bleeding but nodded her head when Rowan asked her if the defendant had done anything to "her private area." Rowan determined that the victim was prepubertal and that menstruation would not have been possible.

---

[2] There was conflicting evidence as to whether the defendant undressed the victim or directed her to undress herself.

State *v.* Michael T.

The day after Rowan's examination of the victim, Monica Vidro, a forensic interviewer at the Yale Child Abuse Clinic (clinic), conducted a forensic interview of the victim. During the interview, the victim reported that the defendant had assaulted her vaginally, orally and anally. The victim was extremely reluctant to speak to Vidro during the interview; her speech was frequently inaudible, and she wept almost continuously.

Rebecca Moles, a child abuse pediatrician with the clinic, examined the victim immediately after the forensic interview. Moles determined that a portion of the victim's hymen was missing as the result of a tearing injury to the adjacent skin and mucosa,[3] resulting in a purplish discoloration of the area. The injury, which Moles likened to "an episiotomy[4] or [the] tearing that can happen with childbirth," was severe and would have caused pain to the victim. (Footnote added.) In addition, because that area of the body is highly vascular, i.e., permeated by blood vessels, the injury would have caused bleeding. Moles concluded that the victim's injury was diagnostic of a prior penetrating trauma. Moles recorded her examination of the victim using a video colposcope, and a still image of the victim's injury taken from the video recording was presented to the jury as an exhibit. Moles again examined the victim two months after her initial examination to assess whether the injury was healing, and a photograph of the injury that she took during that examination was also presented to the jury.

---

[3] Mucosa is the moist tissue that lines certain parts of the inside of the body. See National Institutes of Health, United States National Library of Medicine, MedlinePlus, "Mucosa" (last modified February 26, 2021), available at https://medlineplus.gov/ency/article/002264.htm (last visited April 19, 2021).

[4] Moles testified that an episiotomy is a medical procedure performed by an obstetrician during childbirth whereby the obstetrician cuts the tissue between the opening of the vagina and the anus in order to prevent a tearing injury.

State *v.* Michael T.

The defendant was charged in a six count information with (1) compelling the victim to engage in vaginal/penile intercourse by the use of force in violation of § 53a-70 (a) (1), (2) having contact with the victim's genital area in a sexual and indecent manner likely to impair her health or morals in violation of § 53-21 (a) (2), (3) compelling the victim to engage in fellatio by the use of force in violation of § 53a-70 (a) (1), (4) causing the victim to have contact with his genital area in a sexual and indecent manner likely to impair her health or morals in violation of § 53-21 (a) (2), (5) compelling the victim to engage in anal intercourse by the use of force in violation of § 53a-70 (a) (1), and (6) having contact with the victim's anus in a sexual and indecent manner likely to impair her health or morals in violation of § 53-21 (a) (2).

Before trial, the trial court granted the prosecutor's request that the victim's stepmother sit with her on the witness stand pursuant to General Statutes § 54-86g (b).[5] The trial court observed that "there's no compelling necessity test [for granting such a request], it's just simply the question of whether it will help [the victim] to testify completely and reliably . . . ." The court further observed, however, that, based on its interview of the victim on the stand in the absence of the jury, "if there were a stronger requirement, [it] would find that in this case, because it's very clear [that the victim] will clam up otherwise."

During trial, the prosecutor asked the victim what the defendant had done to her. The victim responded,

_____

[5] General Statutes § 54-86g (b) provides in relevant part: "In any criminal prosecution of an offense involving assault, sexual assault or abuse of a child twelve years of age or younger, the court may, upon motion of the attorney for any party, order that the following procedures be used when the testimony of the child is taken . . . (2) an adult who is known to the child and with whom the child feels comfortable shall be permitted to sit in close proximity to the child during the child's testimony, provided such person shall not obscure the child from the view of the defendant or the trier of fact . . . ."

State *v.* Michael T.

"[h]e hurt me." The prosecutor then asked her, "how did he hurt you? Did he hurt your private?"[6] The victim responded, "[y]es." After the victim responded, defense counsel made an objection, which the trial court overruled. The prosecutor then asked the victim, "what did [the defendant] hurt your private with?" The victim responded, "[h]is private." A short time later, the prosecutor asked the victim, "[w]hat does he do . . . when you're on the bed? You said he put his private in your private." After the victim responded "[y]es," defense counsel objected, and the trial court again overruled the objection. During subsequent questioning of the victim, the prosecutor indicated on several occasions that the defendant had "put his private in [the victim's] private."[7] On redirect examination, the prosecutor asked the victim: "[J]ust so everybody understands, where did [the defendant's] private go, in or outside of your private?" The victim responded, "[i]n."

The prosecutor also asked the victim whether anything had "come out of [her] private or [the defendant's] private . . . ." She responded "[h]is" and indicated that the substance was blood. The prosecutor then asked: "And where did the blood—it came out of your private and went where? The bed, your underwear, his—on him, where?" The victim responded, "[b]ed." The victim also testified that the defendant had put his "private" in her "private" on multiple occasions, that he had put his "private" inside her mouth, that he had put his "pri-

---

[6] During the forensic interview of the victim, the victim indicated that she referred to genitals as "privates." A redacted video recording of the interview was presented to the jury.

[7] The prosecutor asked the following questions: "[W]here was [the defendant] when he put his private in your private?" "[W]hen he put his private in your private . . . how did it feel?" "Did [the defendant put his private in your mouth] on the same day he put his private in your private or a different day?" "When [the defendant] put his private in your private, were you on your stomach, your back, your side, which?" And "when [the defendant] put his private in your private, did he tell you that this was okay because he did it to your mom, too?"

State *v.* Michael T.

vate'' inside her ''butt,'' and that, during one of the assaults, he held her face down on the bed so that she had difficulty breathing.[8]

The victim further testified that she was frightened of the defendant. The victim's aunt testified that, when the victim came to stay with her, the victim would not want to return home because she was scared and that, when they saw the defendant at a store once during an outing, the victim cried and tried to hide behind her.

Lisa Melillo, a school psychologist and trained forensic interviewer, testified as an expert witness for the state about behaviors that are typical for children who have been sexually abused. Melillo testified that trauma can heighten a child's memory of an event and that sexual abuse by a person known to the child can increase the trauma.

During closing argument, the prosecutor stated to the jury: ''I . . . want to thank you for the attention that you have paid to the evidence in this case, and I could see sometimes it wasn't as easy as it either would've been, should've been, if it were a different type of trial, and I apologize for any anxiety any of the evidence may have caused you. . . . I also want to apologize for the photos that you had to view. The state tried to keep it to a minimum. Unfortunately, it was necessary that you viewed them.''

Defense counsel stated to the jury during closing argument that ''[t]his is an exceptionally difficult and disappointing and disgusting case, and I am very thankful that you came down here and sat through this . . . . [I]t's a very emotionally compelling case; it's a case that gets you fired up . . . .'' Defense counsel also argued that the victim had fabricated the allegations that the

_____

[8] The victim stated during the forensic interview that this occurred when the defendant penetrated her anally.

State *v.* Michael T.

defendant had sexually assaulted her because "she wanted out of that house . . . ." Defense counsel further argued that the victim might have identified the defendant as the person who assaulted her because of Rowan's suggestive question to the victim during her initial examination at the Fair Haven Community Health Center whether the defendant had done anything to her "private area."

During rebuttal argument, the prosecutor stated that "[defense counsel] . . . asked you to assume, not draw a reasonable inference, but assume that the reason [the victim] brought all of this up is that she wanted out of the house. Did you hear anyone on that witness stand say anything about her wanting out of the house? Does she look like the type of child who would have been evil enough to make this up to get out of the house?" The prosecutor further stated that "[the victim] is an extremely passive, helpless girl folding in on herself, shy, painfully shy. She was highly uncomfortable. In the forensic [interview], there were tears, she was embarrassed. Were those emotions real? The state submits to you absolutely they were. It's easy to fake facts. It's much harder to fake emotion like you saw [in] the forensic [interview] and on that witness stand."

Later during rebuttal, the prosecutor stated: "Moles talked about that scar below where the hymen is missing. She said it's a scar, it was a tearing injury similar to an episiotomy. [The victim] did not have the luxury of an episiotomy and a doctor who could give her . . . some sort of pain medication. She was ripped. You heard the doctor say that was a tearing injury."

The prosecutor also asked, with reference to the victim's testimony that the defendant had held her head against the bed during one of the assaults: "Does she look like a child who's sophisticated enough to give you that kind of facts? If wishes could come true, this

State *v.* Michael T.

would never have happened, but it did. [The victim] told people in 2015, and she told them and told you in 2018, and, if wishes could come true, we wouldn't have to have witnesses like [the victim], children, who have to be—who have to become embarrassed, they have to show you their pain, they have to describe to you their betrayal of trust, and show you [their] tears, all when she was seven and eight.''

During the course of the trial, the trial court conducted a conference with the prosecutor and defense counsel to review the court's proposed jury instructions. Defense counsel objected to the proposed instruction that the jury could draw no unfavorable inference from the defendant's ''failure'' to testify, arguing that ''[the word failure] gives a negative connotation, and it makes it seem as though he had an obligation and he failed to do it.'' Defense counsel requested that the trial court instead instruct the jury that the defendant ''elected not to testify.'' The trial court stated that ''the legislature mandates this charge'' and indicated that, if the court did not give the instruction in ''the way that the legislature mandates, that itself may be plain error.'' Accordingly, the trial court denied the defendant's request. The court ultimately instructed the jury that ''[t]he defendant has not testified in this case. An accused person has the option to either testify or not testify at trial. He's under no obligation to testify. He has a constitutional right not to testify. You must draw no unfavorable inference from the defendant's failure to testify.''

The jury found the defendant guilty on all counts. The court rendered judgment in accordance with the verdict and sentenced the defendant to twenty years imprisonment on each count, with the first two counts to run concurrently with each other, the third and fourth counts to run concurrently with each other, and the fifth and sixth counts to run concurrently with each

State *v.* Michael T.

other. The first, third and fifth counts were to run consecutively to each other, for a total effective sentence of sixty years imprisonment.

This appeal followed. The defendant claims on appeal that the prosecutor, while questioning the victim and during closing and rebuttal arguments, improperly assumed facts not in evidence, vouched for the victim's credibility and appealed to the jurors' emotions, and that these improprieties deprived him of his due process right to a fair trial. The defendant also contends that the trial court violated § 54-84 (b) when it denied his request to instruct the jury that it could draw no unfavorable inference from the fact that he "elected" not to testify and, instead, referred to his "failure" to testify. He further contends that, if we conclude that § 54-84 (b) authorized the trial court to refer to his "failure to testify," even though he requested alternative language, the statute infringed on his constitutional right to remain silent. We reject all of these claims.

I

We first address the defendant's claims that the prosecutor improperly referred to facts not in evidence when she asked the victim (1) "[y]ou said [the defendant] put his private in your private," and other questions using that phrase, and (2) "the blood . . . came out of your private and went where," and other questions using that phrase. We conclude that these questions did not constitute prosecutorial impropriety.

At the outset, we address the state's assertion that these claims are not reviewable because they are not constitutional in nature, as the defendant contends, but are instead unpreserved evidentiary claims insofar as defense counsel did not properly object to the prosecutor's questions at trial.[9] This court has repeatedly held

[9] The state acknowledges that defense counsel objected when the victim responded "[y]es" to the prosecutor's question, "[y]ou said he put his private in your private . . . [i]s that when it happened," but contends that the

State *v.* Michael T.

that, ''[i]n cases of unpreserved claims of prosecutorial [impropriety] . . . it is unnecessary for the defendant to seek to prevail under the specific requirements of . . . [*State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn 733, 781, 120 A.3d 1188 (2015)] . . . and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test. The reason for this is that the touchstone for appellate review of claims of prosecutorial [impropriety] is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987).'' (Internal quotation marks omitted.) *State* v. *Spencer*, 275 Conn. 171, 178, 881 A.2d 209 (2005). We also have held, however, that ''unpreserved evidentiary claims masquerading as constitutional claims will be summarily dismissed'' as unreviewable. *State* v. *Golding*, supra, 241.

In the present case, the state contends that the defendant's claims that the prosecutor engaged in prosecutorial impropriety during her questioning of the victim are actually evidentiary claims because he is challenging the manner in which the prosecutor phrased the questions, not the information that the prosecutor sought to elicit. The state further contends that the questions that the defendant is challenging were permissible leading questions. We conclude that we need not resolve this issue because the defendant cannot prevail on the merits of his claims. See, e.g., *State* v. *William L.*, 126 Conn. App. 472, 483 n.11, 11 A.3d 1132 (''[w]e do not need to decide whether the defendant waived his claim, as we resolve the claim on other grounds''), cert. denied, 300 Conn. 926, 15 A.3d 628 (2011). Indeed,

claims related to this question are unreviewable because defense counsel did not object until after the victim answered and did not indicate the basis for the objection.

to determine whether the defendant's claims are reviewable constitutional claims or unreviewable evidentiary claims, we would have to determine whether the prosecutor's questions improperly assumed facts not in evidence or reflected reasonable inferences from the evidence, which is precisely the same analysis that we apply to the claims on their merits.[10] Cf. *State* v. *Spencer*, supra, 275 Conn. 178 (application of *Golding* test is superfluous when considering claim of prosecutorial impropriety because determining whether due process rights were violated requires court to consider "the fairness of the entire trial, and not the specific incidents of [impropriety] themselves" (internal quotation marks omitted)).

We turn, therefore, to the merits of the defendant's claims. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry." (Cita-

---

[10] Although the state cites authority for the proposition that the prosecutor may ask leading questions of certain state witnesses; see, e.g., Conn. Code Evid. § 6-8 (b), commentary (under § 6-8 (b) (3), "the court may allow the calling party to put leading questions to a young witness who is apprehensive or reticent"); "a prosecutor is not permitted to pose a question that implies the existence of a factual predicate when the prosecutor knows that no such factual basis exists." *State* v. *Salamon*, 287 Conn. 509, 564, 949 A.2d 1092 (2008). We further note that there are circumstances under which even an evidentiary error can rise to the level of a constitutional violation. See, e.g., *State* v. *Turner*, 334 Conn. 660, 675, 224 A.3d 129 (2020) ("[a] claim of evidentiary error . . . premised on a generalized violation of a party's due process right is constitutional in nature [only] if the harm resulting from the error is sufficient to require a new trial" (internal quotation marks omitted)).

State *v.* Michael T.

tions omitted; internal quotation marks omitted.) *State* v. *Long*, 293 Conn. 31, 36–37, 975 A.2d 660 (2009).

"A prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . Statements as to facts [that] have not been proven amount to unsworn testimony . . . ." (Citations omitted.) *State* v. *Williams*, supra, 204 Conn. 544; see also *State* v. *Fauci*, 282 Conn. 23, 49, 917 A.2d 978 (2007) ("[w]e long have held that a prosecutor may not comment on evidence that is not a part of the record"). "[W]hen a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury." *State* v. *Singh*, 259 Conn. 693, 718, 793 A.2d 226 (2002).

In the present case, the defendant contends that the prosecutor improperly referred to facts not in evidence during her examination of the victim when she stated that (1) the defendant "put his private in [the victim's] private," and (2) "blood . . . came out of [the victim's] private . . . ." We disagree. With respect to the first claim, we note that the victim had testified that the defendant hurt her "private" with his "private." We cannot conceive how the defendant could have done so without penetrating the victim's genital area with his penis. Accordingly, although it may have been preferable for the prosecutor to ask the victim a question to clarify this issue instead of stating "[y]ou said he put his private in your private," this statement was not just a reasonable inference from the victim's testimony; it was a necessary inference. Moreover, the victim expressly testified on redirect examination that the defendant's "private" went "[i]n" her "private." In addition, later witnesses provided ample evidence that the victim had suffered a traumatic penetrating injury to her genital

State *v.* Michael T.

area.[11] Indeed, the defendant did not dispute that that was the case but contended only that he was not the perpetrator. We further note that defense counsel raised no objection to the prosecutor's questions rephrasing the victim's testimony. See *State* v. *Medrano*, 308 Conn. 604, 612, 65 A.3d 503 (2013) ("defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was [improper] in light of the record of the case at the time" (internal quotation marks omitted)). Finally, we note that the child victim was, quite understandably, a very challenging witness who was extremely reluctant to provide details of the sexual assaults to which she allegedly had been subjected. Under these circumstances, we cannot conclude that the prosecutor's reframing of the victim's testimony that the defendant had hurt her "private" with his "private" as testimony that the defendant had put his "private" in her "private" was a deliberate attempt to distort the testimony or to suggest that the prosecutor had knowledge of facts that could not be presented to the jury. We conclude,

---

[11] The Appellate Court has observed that "it is not improper for a prosecutor, when using leading questions to examine a hostile witness, to include facts in those questions—as to which no other evidence has yet been introduced—as long as the prosecutor has a good faith basis for believing that such facts are true." *State* v. *Marrero*, 198 Conn. App. 90, 105, 234 A.3d 1, cert. granted, 335 Conn. 961, 239 A.3d 1214 (2020); see also *State* v. *Payne*, 233 Ariz. 484, 512, 314 P.3d 1239 (2013) (prosecutor's use of leading question was proper when prosecutor had "a good faith basis for the question"), cert. denied, 572 U.S. 1004, 134 S. Ct. 1518, 188 L. Ed. 2d 454 (2014); cf. *Commonwealth* v. *Wynter*, 55 Mass. App. 337, 339, 770 N.E.2d 542 (prosecutor's use of leading questions was improper when questions had no "mooring in evidence in the trial record or a presented good faith basis"), review denied, 438 Mass. 1102, 777 N.E.2d 1264 (2002). We similarly conclude that, if a prosecutor has a good faith basis to believe that evidence of a fact will be later admitted, courts may consider that circumstance when determining whether the prosecutor's reference to the fact while questioning a witness was improper, even if the reference was not part of a leading question. Because the question is not before us, we express no opinion on what other circumstances might constitute a good faith basis for a prosecutor's reference to a fact not in evidence while questioning a witness.

State *v.* Michael T.

therefore, that the prosecutor did not improperly refer to facts not in evidence.

For similar reasons, we conclude that the prosecutor's questions that were premised on her statement that blood came out of the victim's "private" were not improper. Again, it would have been preferable for the prosecutor to ask additional questions allowing the witness to clarify and correct her plainly mistaken testimony that the blood came out of the defendant, or to ask the victim if, at any point after the assaults, blood had come out of her "private," instead of making a statement to that effect. The question "it came out of your private and went where" was not significantly more suggestive of independent knowledge of facts, however, than the leading question "isn't it true that blood came out of your private" would have been, and it would have been well within the trial court's discretion to allow the prosecutor to lead this young, apprehensive and reluctant witness on this point. See Conn. Code Evid. § 6-8 (b), commentary (under § 6-8 (b) (3), "the court may allow the calling party to put leading questions to a young witness who is apprehensive or reticent"); see also *State* v. *Salamon*, 287 Conn. 509, 560, 949 A.2d 1092 (2008) (trial court properly permitted prosecutor to use leading questions when examining victim, who was sixteen years old, nervous, very soft-spoken, uneasy and reticent); *State* v. *Marrero*, 198 Conn. App. 90, 105, 234 A.3d 1 ("it is not improper for a prosecutor, when using leading questions to examine a hostile witness, to include facts in those questions—as to which no other evidence has yet been introduced—as long as the prosecutor has a good faith basis for believing that such facts are true"), cert. granted, 335 Conn. 961, 239 A.3d 1214 (2020). This is particularly so because it is within the knowledge of an ordinary juror that blood does not come out of a penis during intercourse. The salient point of the victim's testimony was

State *v.* Michael T.

that there was blood in her genital area immediately after the assault, not her belief as to the source of the blood. Indeed, the prosecutor acknowledged during her rebuttal argument to the jury that the victim had stated that blood came out of the defendant's penis and argued that the jury could reasonably infer that, at the age of seven or eight, the victim simply did not know where the blood in her genital area came from. We further note that other witnesses provided evidence that the traumatic, penetrating injuries to the victim's genital area had resulted in copious bleeding; the defendant never disputed that fact, and he raised no objection to the questions to the victim at the time of trial. We conclude, therefore, that the prosecutor did not engage in prosecutorial impropriety during her questioning of the victim.

II

We next address the defendant's claim that the prosecutor engaged in prosecutorial impropriety during closing and rebuttal arguments by arguing facts not in evidence, appealing to the jurors' emotions and vouching for the victim's credibility. We disagree.

"As we previously have recognized, prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prose-

State *v.* Michael T.

cutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused [is] guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and [well established] rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider." (Internal quotation marks omitted.) *State* v. *Martinez*, 319 Conn. 712, 727–28, 127 A.3d 164 (2015).

"Furthermore, a prosecutor may not express her own opinion, either directly or indirectly, as to the credibility of a witness or the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony. . . . These expressions of opinion are particularly difficult for the jury to ignore because of the special position held by the prosecutor. . . . A prosecutor's voucher for a witness is particularly dangerous for two reasons. First, such comments may convey the impression that the prosecutor is aware of evidence supporting charges against the defendant of

State *v.* Michael T.

which the jury has no knowledge. . . . Second, the prosecutor's opinion carries with it the imprimatur of the [state] and may induce the jury to trust the [state's] judgment rather than its own view of the evidence. . . . [I]t is axiomatic that a prosecutor may not advance an argument that is intended solely to appeal to the jurors' emotions and to evoke sympathy for the victim or outrage at the defendant. . . . An appeal to emotions, passions, or prejudices improperly diverts the jury's attention away from the facts and makes it more difficult for it to decide the case on the evidence in the record. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors [that] are likely to skew that appraisal. . . . An improper appeal to the jurors' emotions can take the form of a personal attack on the defendant's character . . . or a plea for sympathy for the victim or her family." (Citation omitted; internal quotation marks omitted.) *State* v. *Maguire*, 310 Conn. 535, 554–55, 78 A.3d 828 (2013).

The defendant in the present case first claims that the prosecutor engaged in prosecutorial impropriety during closing argument when she stated: "I . . . want to thank you for the attention that you have paid to the evidence in this case, and I could see sometimes it wasn't as easy as it either would've been, should've been, if it were a different type of trial, and I apologize for any anxiety any of the evidence may have caused you. . . . I also want to apologize for the photos that you had to view. The state tried to keep it to a minimum. Unfortunately, it was necessary that you viewed them." The defendant contends that these comments argued facts not in evidence, namely, that viewing the evidence had been difficult and caused anxiety to the jurors, and that the state had additional evidence that it did not present at trial. The defendant further contends that

State *v.* Michael T.

the comments appealed to the jurors' emotions and were intended to evoke outrage at the defendant.

We are not persuaded. As we have explained, "a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper." (Internal quotation marks omitted.) *State* v. *Martinez*, supra, 319 Conn. 727. Indeed, the Appellate Court has found even more forceful rhetoric to be proper in a case involving very similar facts. In *State* v. *Williams*, 65 Conn. App. 449, 783 A.2d 53, cert. denied, 258 Conn. 927, 783 A.2d 1032 (2001), "[t]he defendant subjected the victim [the young daughter of the defendant's girlfriend] to repeated sexual acts, including vaginal intercourse, digital penetration, fellatio and cunnilingus." Id., 452. During closing argument, the prosecutor stated that "[the] case involves many brutal, violent and unpleasant facts. . . . The six year old . . . was the victim of horrible and repulsive crimes and she suffered this degradation at the hands of the defendant . . . . She was humiliated in the worst way imaginable." (Internal quotation marks omitted.) Id., 467. The Appellate Court concluded that these comments were "not improper in view of the evidence presented." Id. Moreover, in the present case, defense counsel himself stated during closing argument that "[t]his is an exceptionally difficult and disappointing and disgusting case, and I am very thankful that you came down here and sat through this . . . . [I]t's a very emotionally compelling case; it's a case that gets you fired up . . . ." It is also significant that defense counsel did not object to the prosecutor's remarks, thereby indicating that he did not believe that they were improper in light of the evidence at the time. See, e.g., *State* v. *Medrano*, supra, 308 Conn. 612. We conclude,

State *v.* Michael T.

therefore, that the remarks were not improper. For the same reasons, we conclude that the prosecutor did not improperly appeal to the jurors' emotions or vouch for the victim's credibility when she stated, "[i]f wishes could come true, this would never have happened, but it did. . . . [A]nd, if wishes could come true, we wouldn't have to have witnesses like [the victim], children, who have to . . . become embarrassed, they have to show you their pain, they have to describe to you their betrayal of trust, and show you [their] tears, all when she was seven and eight."

With respect to the defendant's claim that, by stating that, with respect to the photographs of the victim's injury, "[t]he state tried to keep it to a minimum," the prosecutor suggested that the state had additional evidence that it did not produce at trial, we conclude that this comment merely indicated that, although, in order to prove its case, the state was required to present evidence that an ordinary person would find difficult to view, the state had made an effort to minimize any discomfort by not dwelling on the most disturbing evidence or making it a focal point throughout the case. At most, the comment could be understood to mean that the state made an effort not to present cumulative evidence. The prosecutor did not suggest that the state was in possession of additional photographic evidence that would strengthen the case against the defendant.

The defendant also claims that the prosecutor improperly appealed to the jurors' emotions and vouched for the victim's credibility when she asked the jurors, "[d]oes [the victim] look like the type of child who would have been evil enough to make this up to get out of the house?" The defendant cites *State* v. *Alexander*, 254 Conn. 290, 755 A.2d 868 (2000), in support of this claim. In *Alexander*, the prosecutor "implied that the victim testified truthfully because she is young and therefore honest. The summation further con-

State *v.* Michael T.

tended that no child would possibly make up a story regarding sexual abuse.'' Id., 305. This court concluded that the remarks were ''improper vouchers for the victim's credibility. Statements such as these [were] likely to sway a jury in favor of the prosecutor's argument without properly considering the facts in evidence. This [was] especially significant in [*Alexander*], [in which] the credibility of the victim and the defendant comprised the principal issue of the case. Improper comments on the part of the prosecutor regarding the veracity of one party over the other can easily skew a proper jury deliberation.'' Id.; see also *State* v. *Singh*, supra, 259 Conn. 708 (it is improper for prosecutor to suggest that, ''in order to acquit the defendant, [the jury] must find that the witness has lied'').

We conclude that the prosecutor's remark in the present case was not improper under *Alexander* and *Singh*. The prosecutor made the remark in response to defense counsel's argument that the victim had fabricated the allegations that the defendant had sexually assaulted her because ''she wanted out of that house . . . .'' Thus, it was defense counsel who initially suggested that the victim was not merely confused or mistaken about the identity of her assailant, but that she had deliberately lied about the defendant's conduct for personal gain. Although we generally disapprove of remarks suggesting to the jury that it must conclude that a witness is deliberately lying and, by implication, evil, before it may question the witness' credibility, the prosecutor here was simply attempting to rebut the defendant's claim to that effect by arguing that the victim's appearance and demeanor did not support the claim. See, e.g., *State* v. *O'Brien-Veader*, 318 Conn. 514, 547, 122 A.3d 555 (2015) (''a prosecutor may argue about the credibility of witnesses, as long as her assertions are based on evidence presented at trial and reasonable inferences that jurors might draw therefrom'' (internal

State *v.* Michael T.

quotation marks omitted)). We further note that, unlike in *State* v. *Alexander*, supra, 254 Conn. 305, the prosecutor did not suggest that the victim was honest because she was young or that *no* child could make up an allegation of sexual abuse, thereby suggesting that she had knowledge of facts that could not be presented to the jury; she suggested only that the jury could infer from *this* child's appearance and demeanor on the stand that she was not lying in order to obtain something of value, namely, getting out of the house.

Similarly, we reject the defendant's claim that the prosecutor improperly appealed to the jurors' emotions and vouched for the victim's credibility when she stated that the victim "is an extremely passive, helpless girl folding in on herself, shy, painfully shy. She was highly uncomfortable. In the forensic [interview], there were tears, she was embarrassed." Again, the prosecutor was responding to defense counsel's argument that the victim had lied by asking the jury to consider the victim's appearance and demeanor. The record reflects that, during her examination of the victim, the prosecutor was required to ask her repeatedly to speak louder, to repeat her response and to lift her head while speaking. In addition, the victim was tearful, withdrawn and obviously uncomfortable during the forensic interview, a video recording of which was shown to the jury. Thus, the prosecutor's assertions were supported by evidence that was before the jury.

The defendant further contends that the prosecutor improperly vouched for the victim's credibility when she asked rhetorically, "[w]ere those emotions real," and stated that "[t]he state submits to you absolutely they were. It's easy to fake facts. It's much harder to fake emotion like you saw [in] the forensic [interview] and on that witness stand." We acknowledge that the propriety of these remarks is a closer question. On the one hand, it is well established that a prosecutor may

State *v.* Michael T.

not express her opinion as to the credibility of a witness, thereby inducing the jury "to trust the [state's] judgment rather than its own view of the evidence." (Internal quotation marks omitted.) *State* v. *Maguire*, supra, 310 Conn. 554. On the other hand, however, jurors "are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion. . . . Therefore, it is entirely proper for counsel to appeal to [the jurors'] common sense in closing remarks." (Internal quotation marks omitted.) *State* v. *O'Brien-Veader*, supra, 318 Conn. 547. Moreover, not every use of a rhetorical flourish by the prosecutor is improper. See, e.g., *State* v. *Martinez*, supra, 319 Conn. 727.

The Appellate Court's decision in *State* v. *Cromety*, 102 Conn. App. 425, 925 A.2d 1133, cert. denied, 284 Conn. 912, 931 A.2d 932 (2007), is instructive on this issue. The defendant in *Cromety* claimed that the prosecutor had improperly asked the jury "[i]s that something somebody would make up" with respect to the victim's testimony that "white stuff came out" when the defendant forced her to perform fellatio, that she did not know at the time what the "white stuff" was, and that, after the assault, she brushed her teeth. (Internal quotation marks omitted.) Id., 438–39. The court concluded that the prosecutor's rhetorical question did not constitute improper vouching for the victim's credibility because he was asking the jury to apply common sense to determine whether the victim was "a vulnerable deaf child or a vengeful stepdaughter, as the defendant claimed." Id., 440.

The present case presents a closer question than *Cromety* did because the prosecutor not only asked a rhetorical question appealing to the jury to evaluate the victim's credibility, but also answered her own question when she stated that "[t]he state submits to you [that

State *v.* Michael T.

the victim's emotions] absolutely . . . were [real].'' It would have been preferable if the prosecutor had not made her remark in the form of a direct opinion but, instead, had phrased it to advocate the state's view that the evidence supports such a finding. Nevertheless, we conclude that neither this statement nor the prosecutor's statements that the victim's emotions were real and that it is ''[hard] to fake emotion like you saw [in] the forensic [interview] and on that witness stand'' improperly induced the jury ''to trust the [state's] judgment rather than its own view of the evidence.'' (Internal quotation marks omitted.) *State* v. *Maguire*, supra, 310 Conn. 554. In context, the statements appealed to the jurors' common sense and life experiences, and referred to evidence that had been presented at trial. See *State* v. *Gibson*, 302 Conn. 653, 661, 31 A.3d 346 (2011) (''when the prosecutor immediately followed [his] recitation of the evidence with the rhetorical question, '[d]id the defendant wilfully [fail] to appear in court on May 5, 2006?' and then responded, 'I think he did,' he was attempting to persuade the jury to draw this inference from the circumstantial evidence of intent that he had just recited, and was not giving improper unsworn testimony or attempting to insinuate that he had secret knowledge of the defendant's guilt''). For the same reasons, we reject the defendant's claim that the prosecutor's rhetorical question, ''[d]oes she look like a child who's sophisticated enough to give you that kind of facts,'' was improper.

The defendant finally claims that the prosecutor improperly appealed to the jurors' emotions when, during rebuttal argument, she stated in reference to the injuries to the victim's genital area that ''[s]he was ripped,'' that she suffered ''a tearing injury similar to an episiotomy'' and that she did not have the luxury of having a doctor prescribe pain medication during the assault. We disagree. The prosecutor made these com-

State *v.* Michael T.

ments in response to defense counsel's contention that the victim may have mistakenly identified the defendant as her assailant because Rowan had suggestively asked her whether the defendant had done anything to her "private area." The state's expert witness, Melillo, had testified that trauma can heighten a child's memory of an incident of sexual abuse, especially if the assailant is known to the child. Accordingly, the jury reasonably could have inferred from the severe nature of the victim's injuries that, contrary to defense counsel's argument, her memory of the assault was accurate. In addition, the comments were responsive to defense counsel's argument that the victim lied about the identity of her assailant because she wanted to get out of the house that she shared with the defendant. The jury reasonably could have inferred that, if the victim had wanted to get out of the house, it was because the defendant had brutally assaulted her. Although the prosecutor did not expressly make these arguments, she did indicate that the severe nature of the victim's injuries went to the defendant's claim that the victim was suggestible, and the jury may take any reasonable inference from the evidence before it. See, e.g., *Champagne* v. *Raybestos-Manhattan, Inc.*, 212 Conn. 509, 544, 562 A.2d 1100 (1989).

We acknowledge, however, that it would have been preferable if the prosecutor had not used the phrase "[s]he was ripped," which arguably has more violent connotations than the language that Moles used to describe the victim's injuries. In addition, we view with some skepticism the prosecutor's mordant observation that, unlike a woman who undergoes an episiotomy during childbirth, the victim did not have the luxury of receiving pain medication during the assault. These comments came very close to the line between permissible comment on the evidence and an impermissible plea for sympathy. Because we conclude that the com-

State *v.* Michael T.

ments did not materially mischaracterize Moles' testimony or exaggerate the severity of the victim's suffering, however, we conclude that they did not cross that line. We conclude, therefore, that the comments were not improper.

III

We finally address the defendant's claim that the trial court violated § 54-84 (b) when it denied the defendant's request to instruct the jury that it could draw no unfavorable inference from the fact that he *elected* not to testify. The defendant also contends that, if we conclude that the trial court was not statutorily required to give the instruction that he requested, § 54-84 (b) infringed on his constitutional right to remain silent to the extent that it authorized the trial court to instruct the jury that it could draw "no unfavorable inferences from the accused's failure to testify." We reject both of these claims.

A

We first address the defendant's statutory claim. The defendant contends that, contrary to the trial court's determination that it was required to instruct the jury using the specific wording of § 54-84 (b), the clause of the statute "[u]nless the accused requests otherwise" required the trial court to give the instruction that he requested. The proper interpretation of § 54-84 (b) is a question of statutory interpretation to which we apply well established rules of construction and over which we exercise plenary review. See, e.g., General Statutes § 1-2z (plain meaning rule); *Canty* v. *Otto*, 304 Conn. 546, 557–58, 41 A.3d 280 (2012) (general rules of construction aimed at ascertaining legislative intent).

We begin our analysis with a review of our past cases construing § 54-84 (b). In *State* v. *Wright*, 197 Conn. 588, 594, 500 A.2d 547 (1985), the defendant, like the

State *v.* Michael T.

defendant in the present case, contended that the trial court had improperly instructed the jury that it could draw no unfavorable inferences from his " 'failure to testify' " because that language implied that he had a duty to testify. This court noted that the trial court had used the specific language of § 54-84 (b). Id. We also observed that this court previously had held that "a failure by the trial court to comply with § 54-84 (b) is plain error . . . and that deviations from the statutory language that alter the meaning of the charge constitute grounds for reversal." (Citations omitted.) Id., 595. In addition, we observed that, "[i]f the defendant felt that the word 'failure' had unfavorable connotations, he could have requested that the court modify the charge or not give it at all." Id. Accordingly, we concluded that "it was not error for the trial court to instruct the jury as it did." Id.

The defendant in *State* v. *Casanova*, 255 Conn. 581, 767 A.2d 1189 (2001), also challenged the trial court's use of the language "failure to testify" to describe the defendant's decision not to testify on the ground that the "use of the word 'failure' had a negative connotation." Id., 597. The defendant had requested that the trial court substitute more "neutral" language, without suggesting any specific alternative. Id., 598. This court observed that "[a] refusal to charge in the exact words of a request . . . will not constitute error if the requested charge is given in substance." (Internal quotation marks omitted.) Id., 599. We further observed that "[a] party always may take exception to the trial court's jury charge or request that the trial court modify its language. See Practice Book §§ 42-19 and 42-24. The language 'unless the accused requests otherwise,' however, permits the defendant to elect whether the court should give the jury an instruction concerning the defendant's failure to testify. . . . We have not interpreted that language to mean that the court *must* use the

State *v.* Michael T.

defendant's requested language.'' (Citation omitted; emphasis in original; footnote omitted.) Id., 600–601. Accordingly, this court concluded that the trial court had properly instructed the jury. Id., 601.

We glean the following principles from these cases. First, a defendant may request, and the trial court may give, a jury instruction that deviates from the specific wording of § 54-84 (b), as long as the instruction does not materially alter the substantive meaning of the statute. See id., 600 (''[a] party always may take exception to the trial court's jury charge or request that the trial court modify its language''); *State* v. *Wright*, supra, 197 Conn. 595 (defendant ''could have requested that the court modify the charge''); *State* v. *Wright*, supra, 595 (only ''deviations from the statutory language that alter the meaning of the charge constitute grounds for reversal'').[12] Second, the trial court is not *required* to grant a

---

[12] This court and the Appellate Court have repeatedly concluded that instructions that deviate from the language of § 54-84 (b) are proper when the instructions convey the substantive meaning of the statute. See *State* v. *Sinclair*, 197 Conn. 574, 584 n.11, 500 A.2d 539 (1985) (''[i]n cases [in which] a no unfavorable inferences charge was given, but in language deviating slightly from the precise wording of the statute, we have examined the entire charge to see if the words as given were sufficient to satisfy the statute''); *State* v. *Boulware*, 183 Conn. 444, 447–48, 441 A.2d 1 (1981) (trial court's deviation from precise language of § 54-84 (b) was not improper when ''a reasonable juror hearing [the] instruction within the context of the entire charge would naturally assume that the defendant's silence formed no part of the case''); *State* v. *Reid*, 22 Conn. App. 321, 327, 577 A.2d 1073 (''[s]ubstituting 'adverse' for 'unfavorable' [was] not improper . . . because the terms are synonymous and such a substitution does not change the meaning of the sentence''), cert. denied, 216 Conn. 828, 582 A.2d 207 (1990); cf. *State* v. *Tatem*, 194 Conn. 594, 599–600, 483 A.2d 1087 (1984) (trial court's instruction that jury could draw '' 'no unreasonable inference' '' from defendant's failure to testify was improper because it ''clearly permitted the jury to draw an unfavorable inference which was also a reasonable inference''); *State* v. *Vega*, 36 Conn. App. 41, 48, 646 A.2d 957 (1994) (trial court's use of word ''unfair'' instead of ''unfavorable'' when giving instruction pursuant to § 54-84 (b) was improper because ''the jury could draw a fair or just, although unfavorable or adverse, inference from the defendant's failure to testify''). But see *State* v. *Townsend*, 206 Conn. 621, 626, 539 A.2d 114 (1988) (''the trial court's minor deviation from the literal wording of

State *v.* Michael T.

defendant's request for an alternative instruction under
§ 54-84 (b) but may give any instruction that accurately
states the law. See *State* v. *Casanova*, supra, 255 Conn.
601 (defendant may request alternative language, but
that does not "mean that the court *must* use the defen-
dant's requested language" (emphasis in original)); see
also *State* v. *Whipper*, 258 Conn. 229, 286, 780 A.2d 53
(2001) ("there is no requirement in . . . § 54-84 (b)
that a trial court must use the language requested by
a defendant when he chooses not to testify"), overruled
in part on other grounds by *State* v. *Cruz*, 269 Conn.
97, 848 A.2d 445 (2004), and *State* v. *Grant*, 286 Conn.
499, 944 A.2d 947, cert. denied, 555 U.S. 916, 129 S. Ct.
271, 172 L. Ed. 2d 200 (2008). Third, § 54-84 (b) requires
the trial court to grant a defendant's request that the
court give no instruction concerning the defendant's
failure to testify. See *State* v. *Casanova*, supra, 600
("[t]he language 'unless the accused requests otherwise'
. . . permits the defendant to elect whether the court
should give the jury an instruction concerning the defen-
dant's failure to testify"). Fourth, in the absence of such
a request, the failure to give a no unfavorable inference
instruction pursuant to § 54-84 (b) is plain error. *State*
v. *Wright*, supra, 595 ("a failure by the trial court to
comply with § 54-84 (b) is plain error"); see also *State*
v. *Carter*, 182 Conn. 580, 581, 438 A.2d 778 (1980) (trial

§ 54-84 (b)" was error, but error was harmless because instruction conveyed
"substantive meaning" of statute); *State* v. *Cobb*, 199 Conn. 322, 324–25,
507 A.2d 457 (1986) (same). We further note that the Connecticut Judicial
Branch's model criminal jury instructions contain the following instruction:
"The defendant has not testified in this case. An accused person has the
option to testify or not to testify at the trial. (He/she) is under no obligation
to testify. (He/she) has a constitutional right not to testify. You must draw
no unfavorable inferences from the defendant's *choice not to testify*."
(Emphasis added.) Connecticut Criminal Jury Instructions 2.2-4, available at
https://www.jud.ct.gov/JI/Criminal/Criminal.pdf (last visited April 19, 2021).
Although the model instructions are not binding on this court; see *Snell* v.
*Norwalk Yellow Cab, Inc.*, 332 Conn. 720, 762, 212 A.3d 646 (2019); the
inclusion of this instruction is at least suggestive that a deviation from the
specific wording of § 54-84 (b) is not automatically plain error.

State *v.* Michael T.

court's failure to give instruction pursuant to § 54-84 (b) was plain error).

These principles are consistent with the underlying purpose of the statute. When § 54-84 (b) was enacted in 1977; see Public Acts 1977, No. 77-360; "neither the United States Supreme Court nor this court had yet recognized the [no adverse inference] instruction as a component of self-incrimination protections." (Internal quotation marks omitted.) *State* v. *Cohane*, 193 Conn. 474, 483, 479 A.2d 763, cert. denied, 469 U.S. 990, 105 S. Ct. 397, 83 L. Ed. 2d 331 (1984); see also *State* v. *Branham*, 171 Conn. 12, 16, 368 A.2d 63 (1976) ("[i]n the absence of controlling statutory provisions the accused is not entitled to an instruction that no opinion prejudicial to him shall be drawn from his failure to testify" (internal quotation marks omitted)). It was not until 1981 that the United States Supreme Court held in *Carter* v. *Kentucky*, 450 U.S. 288, 101 S. Ct. 1112, 67 L. Ed. 2d 241 (1981), that "a state trial judge has the constitutional obligation, upon proper request, to minimize the danger that the jury will give evidentiary weight to a defendant's failure to testify" by giving a no adverse inference instruction. Id., 305; see *State* v. *Cohane*, supra, 483. It is reasonable to conclude, therefore, that the purpose of § 54-84 (b) was to fill this statutory gap and to ensure prophylactically that the defendant would pay no price for exercising his constitutional right to remain silent. Thus, it is also reasonable to conclude that the statute was intended to create a *floor* of prophylactic protection, not a ceiling. Indeed, we can perceive no reason why the legislature would have wanted to bar trial courts from deviating from the specific language of the statute when instructing the jury, as long as the courts give an instruction that is at least as protective of the defendant's constitutional right as the statutory language.[13] To the extent that this court has previously

_____

[13] Of course, we do not suggest that the trial court has unlimited discretion to deviate from the statutory language when giving a no adverse inference

State *v.* Michael T.

held that a minor deviation from the specific wording of § 54-84 (b) is improper, even if the instruction does not alter the substantive meaning of the statute; see, e.g., *State* v. *Townsend*, 206 Conn. 621, 626, 539 A.2d 114 (1988) ("the trial court's minor deviation from the literal wording of § 54-84 (b)" was error, but error was harmless because instruction conveyed "the substantive meaning" of statute); *State* v. *Cobb*, 199 Conn. 322, 324–25, 507 A.2d 457 (1986) (same); those cases are hereby overruled.

We conclude, therefore, that the trial court in the present case incorrectly determined that *any* deviation from the specific wording of § 54-84 (b) would be plain error. Because instructing the jury that the defendant "elected" not to testify instead of referring to his "failure" to testify would not have mischaracterized the defendant's conduct in any way and would not have altered the substantive meaning of the statute, we conclude that the trial court could have given the instruction that the defendant requested. Indeed, the state does not contend otherwise.

Contrary to the defendant's contention, however, we have already expressly rejected the proposition that, if a defendant requests that the trial court give a no unfavorable inference instruction that deviates from the specific wording of § 54-84 (b), the trial court is *required* to give that instruction. See *State* v. *Casanova*, supra, 255 Conn. 600–601. Indeed, it would make little sense for the legislature to mandate that the trial court *must* give *whatever* instruction the defendant asks for

instruction, as long as the instruction is at least as protective as § 54-84 (b). For example, it would obviously be improper for a trial court to give an instruction that the fifth amendment prevented the defendant from testifying or that the jury must draw a favorable inference from the fact that the defendant did not testify because it implied confidence in the weakness of the state's case. We hold only that a deviation from the statutory language that does not mischaracterize the facts and that conveys the substantive meaning of the statute is not improper.

State *v.* Michael T.

in lieu of the specific wording of § 54-84 (b). Rather, it is reasonable to conclude that the legislature intended that the trial court may give any instruction that accurately states the law, which obviously would include an instruction that contains the specific wording of the statute.

We also disagree with the defendant's claim that *Casanova* is distinguishable because, unlike in the present case, the defendant in that case did not ask for a specific instruction. Nothing in *Casanova* suggests that the absence of such a request had any bearing on our holding that the trial court is not required to grant a request for an instruction that deviates from the wording of § 54-84 (b). We also conclude that the defendant's claim that our decision in *Casanova* should be overruled because it was incorrect as a matter of statutory interpretation is unreviewable because it has been inadequately briefed. See, e.g., *Estate of Rock* v. *University of Connecticut*, 323 Conn. 26, 33, 144 A.3d 420 (2016) ("Claims are inadequately briefed when they are merely mentioned and not briefed beyond a bare assertion. . . . Claims are also inadequately briefed when they . . . consist of conclusory assertions . . . with no mention of relevant authority and minimal or no citations from the record . . . ." (Internal quotation marks omitted.)). The defendant has merely made the bare assertion that the case should be overruled, without citing any authority or providing any analysis as to why he believes that this court misconstrued § 54-84 (b).[14]

_____

[14] In his reply brief, the defendant contends for the first time that *Casanova* was wrongly decided because to conclude that the legislature wanted trial courts "to give an instruction that would suggest to the jury that the defendant had done something wrong by invoking [the right to remain silent] defies all common sense." "It is a well established principle that arguments [cannot] be raised for the first time in a reply brief." (Internal quotation marks omitted.) *State* v. *Garvin*, 242 Conn. 296, 312, 699 A.2d 921 (1997). In any event, the defendant does not dispute that § 54-84 (b) expressly authorizes the trial courts to use the word "failure," and he does not explain why the legislature would have used that language if, contrary to our decision in *Casanova*, its intent was to *require* trial courts to use more neutral

State *v.* Michael T.

We conclude, therefore, that § 54-84 (b) did not require the trial court to grant the defendant's request to instruct the jury that the defendant had elected not to testify.

B

We next address the defendant's claim that § 54-84 (b) is unconstitutional to the extent that it authorizes the trial court to refer to the defendant's "failure to testify" when giving a no unfavorable inference instruction.[15] We are not persuaded.

"Determining the constitutionality of a statute presents a question of law over which our review is plenary. . . . It [also] is well established that a validly enacted statute carries with it a strong presumption of constitutionality, [and that] those who challenge its constitutionality must sustain the heavy burden of proving its unconstitutionality beyond a reasonable doubt. . . . The court will indulge in every presumption in favor of the statute's constitutionality . . . . Therefore, [w]hen a question of constitutionality is raised, courts must approach it with caution, examine it with care, and sustain the legislation unless its invalidity is clear." (Internal quotation marks omitted.) *Allen* v. *Commissioner of Revenue Services*, 324 Conn. 292, 314, 152 A.3d 488 (2016), cert. denied, U.S. , 137 S. Ct. 2217, 198 L. Ed. 2d 659 (2017).

The fifth amendment to the United States constitution prohibits the government from forcing a defendant to be a witness against himself, and the United States

language at the defendant's request. If the legislature had wanted to require trial courts to use more neutral language, we cannot conceive why it would not have used more neutral language in the statute. Thus, the defendant's argument goes more properly to his claim that the statute is unconstitutional, a claim that was not raised in *Casanova.*

[15] Although unpreserved, this claim is reviewable pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40 (unpreserved claim is reviewable if record is adequate for review and claim is of constitutional magnitude).

State *v.* Michael T.

Supreme Court has concluded that this protection also prohibits prosecutors from commenting at trial on the defendant's decision not to testify.[16] *Griffin* v. *California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965); see also *State* v. *Parrott*, 262 Conn. 276, 292, 811 A.2d 705 (2003) ("[i]t is well settled that comment by the prosecuting attorney . . . on the defendant's failure to testify is prohibited by the fifth amendment to the United States constitution" (internal quotation marks omitted)). "In *Griffin*, the court reasoned that allowing a prosecutor to comment on the defendant's refusal to testify would be equivalent to imposing a penalty for exercising his constitutional right to remain silent." *State* v. *A. M.*, 324 Conn. 190, 200, 152 A.3d 49 (2016).

In addition, as we have already explained, "an accused who exercises his right to refuse to testify has a constitutional right to a no adverse inference instruction when requested" under *Carter* v. *Kentucky*, supra, 450 U.S. 288. *State* v. *Smith*, 201 Conn. 659, 662, 519 A.2d 26 (1986). "The raison d'etre for . . . the constitutional right [to such an instruction] . . . is to reduce to a minimum jury speculation as to why an accused would remain silent in the face of a criminal accusation. 'No judge can prevent jurors from speculating about why a defendant stands mute in the face of a criminal accusation, but a judge can, and must . . . use the unique power of the jury instruction to reduce that speculation to a minimum.' *Carter* v. *Kentucky*, supra, 303." *State* v. *Smith*, supra, 662–63; see also *State* v. *Ruocco*, 322 Conn. 796, 804, 144 A.3d 354 (2016) ("[w]ithout proper instructions . . . a jury may prejudge a defendant because he failed to take the stand and [to] protest his

---

[16] The self-incrimination clause of the fifth amendment is made applicable to state prosecutions through the due process clause of the fourteenth amendment to the United States constitution. E.g., *Malloy* v. *Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964).

State *v.* Michael T.

innocence in the face of a criminal accusation'' (internal quotation marks omitted)).

The defendant in the present case contends that the "failure to testify" language of § 54-84 (b) "implies that the defendant [did] something wrong by exercising his right not to testify." He points out that one source's definition of the word "failure" includes "an act or instance of failing or proving unsuccessful; lack of success," "nonperformance of something due, required, or expected," and "a subnormal quantity or quality; an insufficiency . . . ." Dictionary.com, available at https://www.dictionary.com/browse/failure (last visited April 19, 2021). Thus, the defendant argues, the word "plants in the minds of the jurors a deficiency about the defense" and effectively penalizes the defendant for exercising his constitutional rights.

The defendant also cites to the decision of the Indiana Court of Appeals in *Moreland* v. *State*, 701 N.E.2d 288 (Ind. App. 1998). In that case, the trial court instructed the jury that "[t]he defendant's failure to testify shall not be considered by the jury in determining the [guilt] or innocence of the defendant." (Internal quotation marks omitted.) Id., 294. The Indiana Court of Appeals concluded that, in the absence of any objection by the defendant, the instruction was not improper. Id. The court also observed, however, that the defendant's claim was "not without merit. In the exercise of their discretion, trial courts when instructing juries may wish to avoid the use of the phrase 'defendant's failure,' which is subject to pejorative construction. A defendant's exercise of his constitutional right not to incriminate himself is not a 'failure.' " Id., 294 n.2.

In *State* v. *Tyson*, 23 Conn. App. 28, 579 A.2d 1083, cert. denied, 216 Conn. 829, 582 A.2d 207 (1990), the Appellate Court considered an identical constitutional claim. The defendant in *Tyson* argued that the use of

State *v.* Michael T.

the word "failure" in § 54-84 (b) "nullifies the presumption of innocence by raising the implication that the defendant had an unmet obligation, an obligation either to respond to the accusation or to prove his innocence." Id., 43. The Appellate Court rejected this claim, reasoning that, even if "the word 'failure' has a negative connotation, [it] cannot agree that it is the word itself [that] generates the prejudice to the defendant. The court's use of this word did not alert the jury to a fact of which it had been unaware, or make it more likely that the jury would draw an adverse inference from the defendant's silence." Id. The Appellate Court further observed that "[t]he jury is patently aware of this failure. The United States Supreme Court has noted that [i]t has been almost universally thought that juries notice a defendant's failure to testify. . . . The laymen's natural first suggestion would probably be that the resort to privilege in each instance is a clear confession of crime." (Internal quotation marks omitted.) Id.

The Appellate Court concluded that "[t]he very nature of the no adverse inference instruction specified in § 54-84 (b) is to dispel and ameliorate the inevitable speculation and to mitigate the damage to the defendant. The defendant [in *Tyson*] merely prefers his own phrasing of this warning not to speculate. Calling such failure by a different name would not completely counter the risk inherent in the defendant's choosing to stand silent, and we cannot fault the [trial] court's adherence to statutory mandates." (Internal quotation marks omitted.) Id., 43–44.

Although we ultimately agree with the Appellate Court's holding in *Tyson*, we do not entirely agree with its analysis. The use of the word "failure" may not "alert the jury to a fact of which it had been unaware"; id., 43; but it does have the tendency to *confirm* the validity of the jury's natural assumption that an innocent person would take the stand to respond to the accusations

State *v.* Michael T.

against him. We therefore agree with the defendant in the present case that the use of more neutral language, such as ''the defendant's choice not to testify,'' or ''the fact that the defendant did not testify,'' would be preferable. Indeed, as the defendant points out, the Connecticut Judicial Branch's model criminal jury instructions contain the following instruction: ''The defendant has not testified in this case. An accused person has the option to testify or not to testify at the trial. (He/she) is under no obligation to testify. (He/she) has a constitutional right not to testify. You must draw no unfavorable inferences from the defendant's *choice not to testify.*'' (Emphasis added.) Connecticut Criminal Jury Instructions 2.2-4, available at https://www.jud.ct.gov/JI/Criminal/Criminal.pdf (last visited April 19, 2021). As we concluded in part III A of this opinion, it is well within the trial courts' discretion to use this alternative language, and we encourage them to do so.

We conclude, however, that the semantic difference between the phrase ''failure to testify'' and the phrase ''choice not to testify'' is too slight to have constitutional significance within the overall context of the jury instruction under consideration. There simply is no completely neutral way to characterize the fact that the defendant did not take the stand, which is why a no adverse inference instruction is constitutionally required upon the defendant's request in the first instance. For example, if the jury were instructed only that the defendant elected not to testify, as was his constitutional right under the fifth amendment, that instruction would in no way curb the natural tendency of the jury to assume that the defendant would not have made that choice if he were innocent. Although the jury would be aware that the defendant had no *obligation* to testify, it would still know that the defendant had the *ability* to testify if he so chose, and, in the absence of a no adverse inference instruction, it would still naturally

State *v.* Michael T.

assume that, by choosing not to testify, he did what an innocent person would not have done. We conclude, therefore, that, although the phrase "failure to testify" has a slightly more negative connotation than the phrase "choice not to testify" because the word "failure" suggests the nonperformance of an obligation, that slight difference does not have a material impact on a defendant's constitutional right to remain silent. This is especially so when, as in the present case, the trial court has expressly instructed the jury that the defendant had no obligation to testify and a constitutional right not to testify. Accordingly, we reject the defendant's claim that § 54-84 (b) is unconstitutional. Having rejected the defendant's other claims on appeal, we affirm the judgment of conviction.

The judgment is affirmed.

In this opinion the other justices concurred.

D'AURIA, J., concurring. I agree with and join parts I and II of the majority opinion. I also agree with and join part III A and B, which concludes that the trial court did not violate (1) General Statutes § 54-84 (b) by denying the request by the defendant, Michael T., to instruct the jury that it could draw no unfavorable inference from his "elect[ion]" not to testify, rather than his "failure" to testify, or (2) his exercise of his constitutional right to remain silent by concluding that the same statute required the trial court to instruct the jury that it could draw "no unfavorable inferences from the accused's *failure* to testify." (Emphasis added.) General Statutes § 54-84 (b). I write briefly and separately because I believe the court's resolution of the defendant's "no unfavorable inference" claims leaves in its wake confusion for trial courts. I respectfully suggest that the legislature consider clarifying whether it intended for courts to use any particular language—

State *v.* Michael T.

including the phrase, "failure to testify"—when giving this legislatively and constitutionally compelled instruction.

The trial court in the present case believed it was required to use the language of the statute ("failure to testify") or risk committing plain error. The court today properly disabuses trial courts of that notion. The majority opinion contains four predicates, which I agree are accurate under our law. First, "a defendant may request, and the trial court may give, a jury instruction that deviates from the specific wording of § 54-84 (b), as long as the instruction does not materially alter the substantive meaning of the statute." Second, the trial court is not *required* to grant a defendant's request for a particular alternative instruction but may give any instruction that accurately states the law. Third, § 54-84 (b) requires the trial court to grant a defendant's request that the court give no instruction concerning the defendant's failure to testify. See *State* v. *Casanova*, 255 Conn. 581, 600, 767 A.2d 1189 (2001). And, fourth, in the absence of a request not to give an instruction at all, the failure to give a "no unfavorable inference" instruction pursuant to § 54-84 (b) is plain error. *State* v. *Wright*, 197 Conn. 588, 595, 500 A.2d 547 (1985).

Even when considering these axioms together, there remains to me something incongruous. Specifically, the majority agrees with the defendant, as do I, that the statutory phrase "failure to testify," while violating no constitutional rule, nonetheless has "the tendency to *confirm* the validity of the jury's natural assumption that an innocent person would take the [witness] stand to respond to the accusations against him." (Emphasis in original.) The majority even goes so far as to "agree with the defendant in the present case that the use of more neutral language, such as 'the defendant's choice not to testify,' or 'the fact that the defendant did not testify,' would be preferable," and states that "it is well

State *v.* Michael T.

within the trial courts' discretion to use this alternative
language, and we encourage them to do so.'' The major-
ity also notes and encourages use of the Judicial Branch's
model criminal jury instructions, which provide in rele-
vant part: ''The defendant has not testified in this case.
. . . You must draw no unfavorable inferences from the
defendant's *choice not to testify*.'' (Emphasis added.)
Connecticut Criminal Jury Instructions 2.2-4, available
at https://www.jud.ct.gov/JI/Criminal/Criminal.pdf (last
visited April 22, 2021). The majority goes so far as to say:
''[W]e can perceive no reason why the legislature would
have wanted to bar trial courts from deviating from the
specific language of the statute when instructing the
jury, as long as the courts give an instruction that is at
least as protective of the defendant's constitutional right
as the statutory language.''[1]

So, where does this leave our trial courts? If it is plain
error to give no instruction even without a request,
presumably, trial courts should have a canned instruc-
tion to give in every case in which a defendant does
not testify. Should courts default to use of the statutory
language? The majority's answer appears to be that they
can, but they don't have to. The majority's answer is
the same when a defendant proposes language that
departs from the legislative language: courts may depart
but don't have to.

Although we might be able to envision examples of
a defendant who wishes for a trial court to use the
statutory phrase, ''failure to testify,'' in its instruction,
it is not apparent to me under what circumstances the
court could appropriately exercise discretion to *decline*
to use alternative language that we have recognized not
only as valid, but preferable. In fact, it is significant to

[1] The majority even overrules cases that have ''previously held that a
minor deviation from the specific wording of § 54-84 (b) is improper, even
if the instruction does not alter the substantive meaning of the statute
. . . .'' (Citations omitted.)

State *v.* Michael T.

me that a committee of the Judicial Branch's criminal
trial judges, presumably after careful consideration of
the statutory language, has proposed a model instruc-
tion that deviates from the statute's language and that
we encourage trial courts to use: ''The defendant has
not testified in this case. . . . You must draw no unfa-
vorable inferences from the defendant's *choice not to
testify*.'' (Emphasis added.) Connecticut Criminal Jury
Instructions, supra, 2.2-4. It is also significant to me
that the state has voiced no objection to the language
in the model instruction.

We could adopt this language, or any other ''neutral''
or ''preferable'' language, as a matter of our supervisory
authority over the administration of justice. ''We ordi-
narily invoke our supervisory powers to enunciate a
rule that is not constitutionally required but that we
think is preferable as a matter of policy.'' (Internal quo-
tation marks omitted.) *Marquez* v. *Commissioner of
Correction*, 330 Conn. 575, 608, 198 A.3d 562 (2019).
We have exercised this authority to ''[adopt] rules
intended to guide the lower courts in the administration
of justice in all aspects of the criminal process''; (inter-
nal quotation marks omitted) *State* v. *Rose*, 305 Conn.
594, 607, 46 A.3d 146 (2012); including numerous times
to direct trial courts to instruct or not to instruct juries
in certain ways. See, e.g., *State* v. *Carrion*, 313 Conn.
823, 852–53, 100 A.3d 361 (2014); *State* v. *Aponte*, 259
Conn. 512, 522, 790 A.2d 457 (2002); *State* v. *Delvalle*,
250 Conn. 466, 475–76, 736 A.2d 125 (1999). The present
case seems to fit the bill: the statutory language does
not violate the constitution, but the majority considers
other language preferable as a matter of policy. It would
be odd if the court's reticence to exercise such authority
in the present case and adopt particular language—the
committee's model instruction or otherwise—stemmed
from an unwillingness to deviate from the legislature's

language because we have in our opinion today encouraged trial courts to do exactly that.

I assume instead that our reluctance derives from the fact that the defendant has not specifically asked that we exercise our supervisory authority. Ultimately, it is for this reason that I do not dissent from the majority's election not to employ its supervisory authority to put its imprimatur on the committee's language or direct particular language. Instead, I humbly suggest that a signal from the legislature after its consideration of the statutory language would be useful so that courts might better understand the extent to which the legislature is wedded to any particular language.

I therefore respectfully concur.

———————————————